**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIIO
EASTERN DIVISION**

| | |
|---|---|
| **SHANNON MCGILL**, | |
| 5591 Bowland Place North, Apartment 403<br>Dublin, OH 43016 | CASE NO. 2:23-cv-3909 |
| and, | |
| **GINA OLIVEIRA**, | JUDGE |
| 3294 Korg Street<br>Powell, OH 43065 | |
| and, | MAGISTRATE JUDGE |
| **JUSTIN CURRY**, | |
| 1210 Dennison Avenue<br>Columbus, OH 43201 | |
| and, | |
| **LAUREL BRENNAN**, | |
| 6965 Fallen Timbers Drive<br>Dublin, OH 43017 | |
| and, | |
| **MELISSA FERNANDEZ**, | |
| 5518 Merriman Road<br>Sylvania, OH 43560 | |
| and, | |
| **CAITLIN KIRKPATRICK**, | |
| 2315 Via Santos<br>Carlsbad, CA 92008 | |
| and, | |

**ADRIENNE HILTON**,

926 Silver Cloud Street
Thousand Oaks, CA 91360

and,

**DELANEY MCCONNELL**,

5422 Lakeview Avenue
Yorba Linda, CA 92886

and,

**SHANNON COLEMAN**,

10469 Summer Ridge Drive
Peyton, CO 80831

and,

**LAUREN BELL**,

1801 North Flagler Drive, Apartment 916
West Palm Beach, FL 33407

and,

**KRISTIN RUYTER**,

127 Woodleaf Drive
Winter Springs, FL 32708

and,

**KATHRYN CROWLEY**,

10100 Bay Meadows, Apartment 1524
Jacksonville, FL 32256

and,

**TAYLOR EDWARDS-MOODY**,

2660 Tilson Road
Decatur, GA 30032

and,

**MARGARET DICKEY**,

378 Carriage Trce
Roswell, GA 30076

and,

**JULIE CERCELLO**,

574 Roxbury Drive
Naperville, IL 60565

and,

**KATIE CAREY**,

375 West Dundee Road, Apartment 465
Wheeling, IL 60090

and,

**ADINA MURRELL**,

6716 Richmond Avenue
Kansas City, MO 64133

and,

**NATALIE EGGLESTON**,

308 North Rochester, Apartment 9
Clawson, MI 48017

and,

**MADISON WEINERT**,

1227 Bamford Street
Waterford Township, MI 48328

and,

**AMY THUREEN**,

16273 Gladiola Avenue West
Rosemount, MN 55068

and,

**CHRISTINA SCOTT**,

856 Oreole Drive
Saint Paul, MN 55124

and,

**STACEY KARELAS**,

5300 Eubank Boulevard, Apartment 18A
Albuquerque, NM 87111

and,

**AMY HASE**,

6669 Fifty-Fifth Avenue South
Fargo, ND 58104

and,

**LISA SMITH**,

1061 Johnnie Dodds Boulevard, Apartment Q2
Mount Pleasant, SC 29464

and,

**BOND BOURQUEIN**,

2740 Lakeside Parkway, Apartment 203
Flower Mound, TX 75022

and,

**MARISSA VITULLI**,

9638 Cane Creek Drive
Houston, TX 77070

and,

**JILL LOUNSBERY**,

101 Promenade Avenue
Williamsburg, VA 23185

and,

**DARLEY TWIDDY**,

117 Woodmere Drive
Williamsburg, VA 23185

                    **PLAINTIFFS**,

        v.

**XPONENTIAL FITNESS LLC**,

C/O Statutory Agent
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

and,

**XPOF ASSETCO, LLC**,

C/O Statutory Agent
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

and,

**AKT FRANCHISE, LLC**,

C/O Statutory Agent
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

and,

**AKT FRANCHISE SPV, LLC**,

C/O Statutory Agent
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

and,

**CYCLEBAR FRANCHISING, LLC**,

C/O Statutory Agent
Corporation Service Company
3366 Riverside Drive, Suite 103
Upper Arlington, OH 43221

and,

**CYCLEBAR FRANCHISING SPV, LLC**,

C/O Statutory Agent
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

and,

**PB FRANCHISING, LLC**,

C/O Statutory Agent
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

and,

**PB FRANCHISING SPV, LLC**,

C/O Statutory Agent
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

and,

**ROW HOUSE FRANCHISE, LLC**,

C/O Statutory Agent
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

and,

**ROW HOUSE FRANCHISE SPV, LLC**,

C/O Statutory Agent
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

and,

**STRIDE FRANCHISE, LLC**,

C/O Statutory Agent
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

and,

**STRIDE FRANCHISE SPV, LLC**,

C/O Statutory Agent
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

and,

**YOGA SIX FRANCHISE, LLC**,

C/O Statutory Agent
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

and,

**YOGA SIX FRANCHISE SPV, LLC**,

C/O Statutory Agent

Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

and,

**MD PRO FITNESS, LLC**,

C/O Statutory Agent
LLC Management Services LLC
145 3rd Avenue South
Edmonds, WA 98020

and,

**MITCH BROWN**,

5714 80th Avenue NE
Marysville, WA 98270

**DEFENDANTS**.

**COLLECTIVE AND CLASS ACTION COMPLAINT
WITH JURY DEMAND**

**TABLE OF CONTENTS**

I.    NATURE OF THE CLAIMS ................................................................................ 1

II.   JURISDICTION AND VENUE ........................................................................... 6

III.  PARTIES ............................................................................................................. 7

      A.    The Plaintiffs ......................................................................................... 7

            1.    The Ohio Plaintiffs ..................................................................... 7

            2.    The California Plaintiffs .............................................................. 8

            3.    The Colorado Plaintiff ................................................................ 9

            4.    The Florida Plaintiffs .................................................................. 9

            5.    The Georgia Plaintiffs .............................................................. 10

            6.    The Illinois Plaintiffs ................................................................ 11

            7.    The Kansas Plaintiff .................................................................. 11

            8.    The Michigan Plaintiffs ............................................................ 11

            9.    The Minnesota Plaintiffs .......................................................... 12

            10.   The New Mexico Plaintiff ........................................................ 12

            11.   The North Dakota Plaintiff ....................................................... 13

            12.   The South Carolina Plaintiff .................................................... 13

            13.   The Texas Plaintiffs .................................................................. 13

            14.   The Virginia Plaintiffs .............................................................. 14

      B.    The Defendants ..................................................................................... 14

            1.    The Xponential Fitness Defendants .......................................... 14

            2.    The MD Pro Fitness Defendants ............................................... 20

IV.   FACTS .............................................................................................................. 21

A.  The Franchising Model of Xponential Fitness ................................... 21

B.  The Mechanics of a Franchise Deal With Xponential Fitness ....................... 27

C.  The Franchise Deal Between Xponential Fitness and Mitch Brown ............... 28

D.  The Franchise Deal Ends in Disaster ................................................. 29

E.  Mitch Brown Disappears and Stops All Communication ............................... 36

F.  The Collapse of the Sixty-Six Franchised Gym Studios ................................. 40

G.  Mitch Brown Resurfaces and Meets with Xponential Fitness ....................... 41

H.  The Failure to Pay For Class Preparation or Training Time ........................ 41

V.  COLLECTIVE ACTION ALLEGATIONS .............................................. 43

A.  The Federal Law Collective Actions .................................................. 43

B.  The Ohio Law Collective Actions ...................................................... 45

VI. CLASS ACTION ALLEGATIONS ................................................... 47

A.  The Ohio Law Class Actions ............................................................ 47

B.  The California Class Actions ........................................................... 48

C.  The Colorado Class Action ............................................................. 48

D.  The Georgia Class Actions .............................................................. 49

E.  Illinois Class Action ...................................................................... 49

F.  Kansas Class Action ....................................................................... 50

G.  The Michigan Class Action .............................................................. 50

H.  The Minnesota Class Actions ........................................................... 50

I.  The New Mexico Class Action .......................................................... 51

J.  The North Dakota Class Actions ....................................................... 51

K.  The South Carolina Class Action ...................................................... 52

|       | L.   | The Virginia Class Actions | 52 |
|       | M.   | The Class Action Requirements for All States | 53 |
| VII.  |      | CLAIMS FOR RELIEF | 55 |
|       | A.   | Federal Law Claims | 55 |
|       |      | COUNT I | 55 |
|       |      | COUNT II | 56 |
|       |      | COUNT III | 57 |
|       |      | COUNT IV | 58 |
|       | B.   | Ohio State Law Claims | 59 |
|       |      | COUNT V | 59 |
|       |      | COUNT VI | 60 |
|       |      | COUNT VII | 61 |
|       |      | COUNT VIII | 62 |
|       | C.   | California State Law Claims | 63 |
|       |      | COUNT IX | 63 |
|       |      | COUNT X | 64 |
|       | D.   | Colorado State Law Claims | 65 |
|       |      | COUNT XI | 65 |
|       | E.   | Georgia State Law Claims | 66 |
|       |      | COUNT XII | 66 |
|       | F.   | Illinois State Law Claims | 67 |
|       |      | COUNT XIII | 67 |
|       | G.   | Kansas State Law Claims | 68 |

COUNT XIV ............................................................................... 68

    **H.**    **Michigan State Law Claims** ................................................ 69

         COUNT XV ........................................................................... 69

    **I.**     **Minnesota State Law Claims** ............................................ 70

         COUNT XVI .......................................................................... 70

         COUNT XVII ......................................................................... 71

    **J.**    **New Mexico State Law Claims** ......................................... 72

         COUNT XVIII ....................................................................... 72

    **K.**    **North Dakota State Law Claims** ....................................... 73

         COUNT XVIV ....................................................................... 73

         COUNT XX ........................................................................... 74

    **L.**    **South Carolina State Law Claims** .................................... 75

         COUNT XXI .......................................................................... 75

    **M.**    **Virginia State Law Claims** ............................................... 76

         COUNT XXII ......................................................................... 76

         COUNT XXIII ....................................................................... 77

         COUNT XXIV ....................................................................... 78

**VIII.**    **PRAYER FOR RELIEF** ............................................................ 79

**IX.**     **JURY DEMAND** ........................................................................ 79

## I.    NATURE OF THE CLAIMS

1.    This matter is a class and collective action for systemic violations of the federal Fair Labor Standards Act (FLSA) and several related state wage-and-hour laws.

2.    Xponential Fitness is a franchisor of boutique fitness brands.  Those brands are AKT, BFT, Club Pilates, CycleBar, PureBarre, Row House, Rumble, Stretch Lab, Stride, and Yoga Six.  As a franchisor, Xponential Fitness contracts with franchisees (a) to open new gym studios or (b) to take over operation of existing company-owned gym studios.  The basic concept is that, in exchange for fees, Xponential Fitness lets franchisees own and operate a gym studio under one of its brands and profit from the brand's goodwill.

3.    Xponential Fitness prides itself on having never closed a franchised gym studio. Instead, when franchisees fail because they cannot make a profit, Xponential Fitness repurchases the gym studio from the franchisee, usually at a discount, and then operates it as a company-owned gym studio.  Xponential Fitness will then seek a new franchisee willing to take over operation of these company-owned gym studios.  Xponential Fitness, however, is also a publicly traded company under the stock ticker "XPOF."  As Anthony Geisler, the founder and Chief Executive Officer of Xponential Fitness, would later admit, his company was losing around $1,000,000 a month on company-owned gym studios.  As a result, Xponential Fitness investors were urging him to either close or sell the company-owned gym studios to new franchisees so Xponential Fitness would improve its cash flow and balance sheet.

4.    That strategy is part of why Xponential Fitness began discussions with MD Pro Fitness, LLC and its owner Mitch Brown.  Mr. Brown already owned and operated a handful of franchised PureBarre gym studios in the State of Minnesota.  He, however, wanted to expand his ownership.  So, on September 1, 2023, Xponential Fitness franchised sixty-six gym studios that

it owned and operated to Mitch Brown through his company MD Pro Fitness LLC. These company-owned gym studios employed over 800 people and consisted of the following brands: AKT, CycleBar, PureBarre, Row House, Stride, and Yoga Six. They also spanned several states, including Arizona, California, Colorado, Florida, Georgia, Illinois, Kansas, Michigan, Minnesota, New Mexico, New York, North Dakota, Ohio, South Carolina, Texas, Virginia, and Wisconsin. As part of this mass-franchising deal, MD Pro Fitness, LLC would become the direct employer of all the studios' employees. Thereafter, it would pay several recurring franchise fees to Xponential Fitness for each studio, including royalties in the form of a percentage of gross sales, technology fees, training fees, and marketing fees.

5.    Anyone could have seen that this mass-franchising deal would fail. Anthony Geisler, the founder and Chief Executive Officer of Xponential Fitness, would later claim that his company allegedly "stringently vetted" Mitch Brown before entrusting him with the operation of sixty-six additional gym studios and over 800 employees across multiple states. But as Mr. Geisler would also later admit, these sixty-six gym studios were collectively losing money. As he put it, "did Mitch get some duds? Yeah, he did." If these sixty-six gym studios were collectively unprofitable and losing $1,000,000 a month when they were owned by Xponential Fitness—and therefore paid no franchise fees—anyone could have predicted that they would be even less profitable once franchised to MD Pro Fitness, LLC and Mitch Brown, who would have to somehow profit despite a litany of franchise fees.

6.    As expected, this mass-franchising deal was a disaster. Almost immediately after MD Pro Fitness, LLC and Mitch Brown acquired the sixty-six gym studios, they ran out of funds. At first, Mr. Brown asked Mr. Geisler and Xponential Fitness to wire him $600,000 for payroll, and they agreed. Shortly after that, Mr. Brown asked Mr. Geisler and Xponential to wire

2

him another $700,000 for payroll, and they once again agreed. Mr. Geisler and Xponential Fitness even suspended franchise fees so Mr. Brown could use the money saved to fund his payroll. Eventually, however, MD Pro Fitness, LLC and Mitch Brown stopped properly and timely paying some, and then all, their employees at the gym studios. During this time, and despite the lack of funds for payroll, Mr. Brown encouraged his over 800 employees at the gym studios to continue working for no pay, as did various management-level employees of Xponential Fitness. Mr. Brown and Xponential Fitness also repeatedly promised the employees that they were working diligently on a solution to ensure everyone was paid. Meanwhile, Mitch Brown's management team at MD Pro Fitness, LLC quit, and Mr. Brown himself disappeared and stopped communicating with anyone. With employees not being paid, and no longer willing to work for free, the sixty-six gym studios are now in the process of losing members, harming the customer goodwill of the brands they represent, and closing their doors.

7. Plaintiffs are the affected employees. And, additionally, they are serving as representatives of the other affected employees in this putative collective and class action. Regardless of job titles and job duties, they all have the following in common: they were not paid anything by Defendants for one or more workweeks. As both the Sixth Circuit and Ninth Circuit have stated, "'the obligation [to pay the minimum wage] kicks in once an employee has done covered work in any workweek,' and that 'if a payday has passed without payment, the employer cannot have met his obligation to pay.'" *Herman v. Fabri-Centers of Am., Inc.*, 308 F.3d 580, 591 (6th Cir. 2002) (quoting *Biggs v. Wilson*, 1 F.3d 1537, 1539 (9th Cir. 1993)). As a result, despite working for Defendants, they did not receive the federal minimum wage for each hour worked during a workweek. Additionally, in each of their states, they were not paid the state minimum wage. Furthermore, in some of these states, they are entitled to various other forms of

3

compensation that result from these wage-and-hour violations. Likewise, for those employees who worked over forty hours in a workweek and were paid nothing, they were not paid the required overtime rate under federal and state law. Finally, as this case was investigated, other systemic wage-and-hour violations by Xponential Fitness and MD Pro Fitness were uncovered, such as not paying instructors and coaches for training or class preparation time.

8. All the defendants share legal responsibility for these wage-and-hour violations as joint employers. To start, Xponential Fitness' franchise agreements are the epitome of total control over a franchisee. The agreements with MD Pro Fitness, LLC and Mitch Brown were no exception. The following are examples of the rights Xponential Fitness retains under its franchise agreements: (a) it gets to select the gym studio location, (b) it gets to mandate the gym studio's internal design, construction, improvements, and layout, including modernization updates; (d) it requires all franchisee owners and instructors to receive mandatory training from its corporate trainers; (e) it sets approved lists of distributors, suppliers, products, and services that the franchisee must use; (f) it requires franchisees to have surveillance cameras with audio at the gym studios that it can access remotely via the Internet at any time to monitor employees and customers; (g) it requires the franchisee to submit any lease agreements for gym studio locations for its prior written consent; (h) it requires franchisees to "comply strictly at all times" with its standards and specifications for appearance and operation of the studio; and (i) it maintains a right to "supervise, determine and approve the standards of appearance, quality, and service" at the franchised gym studios, among other rights.

9. Further demonstrating the necessary control for joint employer status, Xponential Fitness also requires franchisees—including MD Pro Fitness, LLC and Mitch Brown—to "strictly comply" with its "Operations Manual," which manages a franchisee's employees down

4

to the smallest of details. For instance, under a section entitled "Operational Standards," Xponential Fitness' manual sets requirements for franchisees on the following subjects: (a) their hours of operation; (b) a "code of conduct" for their employees; (c) a dress code for their employees; (d) a personal hygiene and appearance code for their employees; and (e) service standards for their employees. The manual even includes a section on "Labor Force" that includes subsections on "Laws and Requirements," "Job Descriptions," "Studio Staffing Best Practice," and "Onboarding & Training."

10. Under Xponential Fitness' franchise agreements, if a franchisee—including MD Pro Fitness, LLC and Mitch Brown—fails to strictly comply with either the franchise agreement or the operations manual, then Xponential Fitness can terminate their franchise.

11. Xponential Fitness also acted like a joint employer. As noted, it paid the payroll for the sixty-six gym studios by wiring MD Pro Fitness, LLC and Mitch Brown $600,000 and then $700,000. Xponential Fitness also suspended royalties so MD Pro Fitness, LLC and Mitch Brown could use that money to pay employees. Likewise, Xponential Fitness continued to pay rent and gym studio expenses. Furthermore, Mitch Brown, while conducting damage control with e-mails to his unpaid employees, represented Xponential Fitness as a "partner" from whom he was taking direction and with whom he was working to correct the payment situation. Anthony Geisler, for his part, represented to franchised employees that he, his executives, and Mitch Brown were jointly formulating a plan on how to address the ensuing disaster from this mass-franchising deal, including discussions on which gym studios to close and which to salvage by selling them to new franchisees.

12. Finally, this failed mass-franchising deal designed to improve Xponential Fitness' balance sheet for the sake of shareholder profit had profoundly negative effects on the employees

who are now plaintiffs in this putative class and collective action. Many of these plaintiffs were full-time employees of Xponential Fitness when their studios were refranchised to MD Pro Fitness, LLC and Mitch Brown. They relied upon their wages to support their families, some as the primary earner for those families. They have now lost that income when the mass-franchising deal predictably failed. Anthony Geisler and Xponential Fitness claimed they "stringently vetted" MD Pro Fitness, LLC and Mitch Brown. That seems exceedingly unlikely given what happened here. The latter claims his financing fell through, but perhaps he overestimated his capacity and ability to operate sixty-six gym studios with over 800 employees across multiple states. Ultimately, it does not matter which parties were the negligent businesspeople—whether it was the franchisor here or the franchisee or both—because both are jointly liable for the unpaid wages under the law.

13.    Accordingly, Plaintiffs have filed this putative class and collective action. They seek to recover for the harm they and others similarly situated have suffered, to punish Defendants for their conduct, and to deter Defendants from ever perpetrating their conduct against any other person.

## II.    JURISDICTION AND VENUE

14.    Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiffs' claims made under federal law because those claims constitute a civil action arising under the Constitution, laws, or treaties of the United States.

15.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' claims made under state law because those claims are so related to the claims made under federal law that they form part of the same case or controversy under Article III of the United States Constitution.

16.     Pursuant to Ohio Revised Code Sections 2307.381-.385, and the Due Process Clauses of the federal and Ohio Constitutions, this Court has personal jurisdiction over Defendants for the following reasons: they transacted business in this state; they caused tortious injury by an act or omission in this state; they caused tortious injury in this state to Plaintiffs by an act outside this state committed with the purpose of injuring Plaintiffs, when they might reasonably have expected that some person would be injured thereby in this state; and/or they purposefully availed themselves of the privilege of acting in Ohio, the causes of action arise out of their activities in Ohio, and the exercise of jurisdiction over them is reasonable.

17.     Pursuant to 28 U.S.C. § 1391(b)(2), this Court is the appropriate venue because the Southern District of Ohio is a judicial district in which a substantial part of the events or omissions giving rise to the claims for relief occurred.

18.     Pursuant to Rule 82.1(e) of the Local Civil Rules of the United States District Court for the Southern District of Ohio, the Eastern Division at Columbus is the appropriate division because the defendants are not residents of the State of Ohio and a substantial part of the events or omissions giving rise to the claims for relief occurred in Delaware and Union counties.

### III.     PARTIES

**A.     The Plaintiffs**

**1.     The Ohio Plaintiffs**

19.     Plaintiff Shannon McGill ("Plaintiff McGill") is a natural person who is a resident of Franklin County, Ohio.  She worked as the general manager of the AKT studio in Powell, Ohio from July 15, 2023 continuing until the present.  During that time, she was directly employed by Defendant Xponential Fitness, LLC.  Once her gym studio was refranchised on or around September 1, 2023, she was jointly employed by Defendants.

20. Plaintiff Gina Oliveira ("Plaintiff Oliveira") is a natural person who is a resident of Delaware County, Ohio. She worked as the lead instructor of the AKT studio in Powell, Ohio from August of 2020 continuing until the present. During that time, she was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was refranchised on or around September 1, 2023, she was jointly employed by Defendants.

21. Plaintiff Justin Curry ("Plaintiff Curry") is a natural person who is a resident of Franklin County, Ohio. He worked as an instructor at the AKT studio in Powell, Ohio from August of 2023 continuing until November 3, 2023. During that time, he was directly employed by Defendant Xponential Fitness, LLC. Once his gym studio was refranchised on or around September 1, 2023, he was jointly employed by Defendants.

22. Plaintiff Laurel Brennan ("Plaintiff Brennan") is a natural person who is a resident of Franklin County, Ohio. She worked as a coach at the Row House studio in Plain City, Ohio from January of 2020 continuing until the present. During that time, she was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was refranchised on or around September 1, 2023, she was jointly employed by Defendants.

23. Plaintiff Melissa Fernandez ("Plaintiff Fernandez") is a natural person who is a resident of Lucas County, Ohio. She worked as general manager and an instructor at the Yoga Six studio in Toledo, Ohio from November of 2022 continuing until the present. During that time, she was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was refranchised on or around September 1, 2023, she was jointly employed by Defendants.

### 2. The California Plaintiffs

24. Plaintiff Caitlin Kirkpatrick ("Plaintiff Kirkpatrick") is a natural person who is a resident of San Diego County, California. She worked as an instructor at the Pure Barre studio

in La Jolla, California from July of 2023 continuing until the present. During that time, she was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

25.  Plaintiff Adrienne Hilton ("Plaintiff Hilton") is a natural person who is a resident of Ventura County, California. She worked as the lead sales associate at the CycleBar studio in Thousand Oaks, California from September of 2022 continuing until the present. During that time, she was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

26.  Plaintiff Delaney McConnell ("Plaintiff McConnell") is a natural person who is a resident of Orange County, California. She worked as the lead instructor at the AKT studio in La Habra, California from November of 2021 until November 15, 2023. During that time, she was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

**3.    The Colorado Plaintiff**

27.  Plaintiff Shannon Coleman ("Plaintiff Coleman") is a natural person who is a resident of El Paso County, Colorado. She worked as a specialist and instructor at the CycleBar studio in Northgate, Colorado from August of 2023 continuing until the present. During that time, she was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

**4.    The Florida Plaintiffs**

28.  Plaintiff Lauren Bell ("Plaintiff Bell") is a natural person who is a resident of Palm Beach County, Florida. She worked as the general manager of the AKT studio in Coral Springs, Florida from June of 2023 until November 6, 2023. During that time, she was directly

employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

29.     Plaintiff Kristin Ruyter ("Plaintiff Ruyter") is a natural person who is a resident of Seminole County, Florida. She worked as the sales manager and acting general manager of the Row House studios in Oviedo, Florida and Winter Park, Florida from June of 2023 continuing until the present. During that time, she was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

30.     Plaintiff Kathryn Crowley ("Plaintiff Crowley") is a natural person who is a resident of Duval County, Florida. She worked as the general manager of the Stride studio in Jacksonville, Florida from May of 2023 until November of 2023. During that time, she was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

**5.     The Georgia Plaintiffs**

31.     Plaintiff Taylor Edwards-Moody ("Plaintiff Edwards-Moody") is a natural person who is a resident of DeKalb County, Georgia. She worked as an instructor at the AKT studio at Inman Park in Atlanta, Georgia from July of 2023 continuing until the present. During that time, she was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

32.     Plaintiff Margaret Dickey ("Plaintiff Dickey") is a natural person who is a resident of Fulton County, Georgia. She worked as the sales manager at the Row House studio in Roswell, Georgia from July of 2023 continuing until the present. During that time, she was

10

directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

**6.      The Illinois Plaintiffs**

33.      Plaintiff Julie Cercello ("Plaintiff Cercello") is a natural person who is a resident of DuPage County, Illinois. She worked as a sales associate at the Row House studio in Naperville, Illinois from September of 2019 continuing until the present. During that time, she was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

34.      Plaintiff Katie Carey ("Plaintiff Carey") is a natural person who is a resident of Cook County, Illinois. She worked as an instructor at the Pure Barre studio in Deerfield, Illinois from 2014 continuing until the present. During that time, she was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

**7.      The Kansas Plaintiff**

35.      Plaintiff Adina Murrell ("Plaintiff Murrell") is a natural person who is a resident of Jackson County, Missouri. She worked as a sales manager at the AKT studio in Leawood, Kansas from April of 2023 continuing until the present. During that time, she was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

**8.      The Michigan Plaintiffs**

36.      Plaintiff Natalie Eggleston ("Plaintiff Eggleston") is a natural person who is a resident of Oakland County, Michigan. She worked as a coach at the Row House studio in Beverly Hills, Michigan from May of 2021 continuing until the present. During that time, she

was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

37. Plaintiff Madison Weinert ("Plaintiff Weinert") is a natural person who is a resident of Oakland County, Michigan. She worked as an instructor or lead instructor at the CycleBar studio in Bloomfield Hills, Michigan from January of 2020 continuing until the present. During that time, she was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

### 9. The Minnesota Plaintiffs

38. Plaintiff Amy Thureen ("Plaintiff Thureen") is a natural person who is a resident of Dakota County, Minnesota. She worked as a sales manager and instructor at the Pure Barre studio in Apple Valley, Minnesota from May of 2023 continuing until the present. During that time, she was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

39. Plaintiff Christina Scott ("Plaintiff Scott") is a natural person who is a resident of Dakota County, Minnesota. She worked as a front desk staff and instructor at the Pure Barre studio in Apple Valley, Minnesota from August of 2023 continuing until the present. During that time, she was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

### 10. The New Mexico Plaintiff

40. Plaintiff Stacey Karelas ("Plaintiff Karelas") is a natural person who is a resident of Bernalillo County, New Mexico. She worked as assistant general manager at the Yoga Six studio in Albuquerque, New Mexico from April of 2023 continuing until the present. During

that time, she was directly employed by Defendant Xponential Fitness, LLC.  Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

### 11. The North Dakota Plaintiff

41.     Plaintiff Amy Hase ("Plaintiff Hase") is a natural person who is a resident of Cass County, North Dakota.  She worked as the general manager and lead instructor at the CycleBar studio in Fargo, North Dakota from October of 2019 continuing until the present.  During that time, she was directly employed by Defendant Xponential Fitness, LLC.  Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

### 12. The South Carolina Plaintiff

42.     Plaintiff Lisa Smith ("Plaintiff Smith") is a natural person who is a resident of Charleston County, South Carolina.  She worked as the lead instructor at the CycleBar studio in Mount Pleasant, South Carolina from April of 2017 continuing until the present.  During that time, she was directly employed by Defendant Xponential Fitness, LLC.  Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

### 13. The Texas Plaintiffs

43.     Plaintiff Bond Bourquein ("Plaintiff Bourquein") a natural person who is a resident of Denton County, Texas.  She worked as the lead instructor of the AKT studio in Plano, Texas from February of 2023 continuing until the present.  During that time, she was directly employed by Defendant Xponential Fitness, LLC.  Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

44.     Plaintiff Marissa Vitulli ("Plaintiff Vitulli") is a natural person who is a resident of Harris County, Texas.  She worked as the general manager of the CycleBar studio in Houston, Texas from August of 2022 continuing until the present.  During that time, she was directly

employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

### 14. The Virginia Plaintiffs

45. Plaintiff Jill Lounsbery ("Plaintiff Lounsbery") is a natural person who is a resident of James City County, Virginia. She worked as a general manager and an instructor at the Pure Barre studio in Williamsburg, Virginia periodically from 2016 continuing until the present. During that time, she was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

46. Plaintiff Darley Twiddy ("Plaintiff Twiddy") is a natural person who is a resident of James City County, Virginia. She worked as the lead instructor at the Pure Barre studio in Williamsburg, Virginia periodically from August of 2015 continuing until the present. During that time, she was directly employed by Defendant Xponential Fitness, LLC. Once her gym studio was franchised on or around September 1, 2023, she was jointly employed by Defendants.

### B. The Defendants

#### 1. The Xponential Fitness Defendants

47. Defendant Xponential Fitness LLC ("Defendant XPOF") is a limited liability company that formed in the State of Delaware and has its principal place of business in Orange County, California. Defendant XPOF is the primary operating company for Xponential Fitness, Inc. Employees who are working for "corporate" are employed by Defendant XPOF. Additionally, employees of company-owned gym studios are employed by Defendant XPOF. Finally, Defendant XPOF employs the employees of Xponential Fitness who control the employees of franchisees using the rights secured by the franchise agreements.

48.     Defendant XPOF Assetco, LLC ("Defendant Assetco") is a limited liability company that formed in the State of Delaware and has its principal place of business in Orange County, California.  Defendant Assetco is a subsidiary of Defendant XPOF.  Defendant Assetco guarantees the obligations as franchisor of the following entities: Defendant AKT Franchise SPV, LLC; Defendant Cyclebar Franchising SPV, LLC; Defendant PB Franchising SPV, LLC; Defendant Row House Franchise SPV, LLC; Stride Franchise SPV, LLC; Yoga Six Franchise SPV, LLC (collectively, the "XPOF SPV Franchising Entities").  To the extent the XPOF SPV Franchising Entities were those who entered into franchise agreements with Defendant MD Pro Fitness LLC and/or Defendant Mitch Brown, then Defendant Assetco and the XPOF SPV Franchising Entities are how Defendant XPOF controlled employees of franchisees using the rights secured by the franchise agreements.

49.     Defendant AKT Franchise, LLC ("Defendant AKT") is a limited liability company that formed in the State of Delaware and has its principal place of business in Orange County, California.  Defendant AKT is a subsidiary of Defendant XPOF.  It was the company that offered AKT-branded studios as franchises for Xponential Fitness.  In March of 2023, it was succeeded by Defendant AKT Franchise SPV, LLC, who became the new entity offering AKT-branded studios as franchises for Xponential Fitness.  Even after Defendant AKT was succeeded by this new entity, it also operated AKT studios repurchased from franchisees for resale to new franchisees such as Defendant MD Pro Fitness, LLC and Defendant Mitch Brown.  To the extent Defendant AKT was the one who entered into franchise agreements with Defendant MD Pro Fitness LLC and/or Defendant Mitch Brown, then Defendant AKT was how Defendant XPOF controlled employees of franchisees using the rights secured by the franchise agreements.

15

50.     Defendant AKT Franchise SPV, LLC ("Defendant AKT SPV") is a limited liability company that formed in the State of Delaware and has its principal place of business in Orange County, California.  As noted, it succeeded Defendant AKT in offering AKT-branded studios as franchises for Xponential Fitness.  To the extent Defendant AKT SPV was the one who entered into franchise agreements with Defendant MD Pro Fitness LLC and/or Defendant Mitch Brown, then Defendant AKT SPV was how Defendant XPOF controlled employees of franchisees using the rights secured by the franchise agreements.

51.     Defendant Cyclebar Franchising, LLC ("Defendant Cyclebar") is a limited liability company that formed in the State of Ohio and has its principal place of business in Orange County, California.  Defendant Cyclebar is a subsidiary of Defendant XPOF.  It was the company that offered Cyclebar-branded studios as franchises for Xponential Fitness.  In March of 2023, it was then succeeded by Defendant Cyclebar Franchising SPV, LLC, who became the new entity offering Cyclebar-branded studios as franchises for Xponential Fitness.  Even after Defendant Cyclebar was succeeded by this new entity, it also operated Cyclebar studios repurchased from franchisees for purposes of resale to new franchisees such as Defendant MD Pro Fitness, LLC and Defendant Mitch Brown.  To the extent Defendant Cyclebar was the one who entered into franchise agreements with Defendant MD Pro Fitness LLC and/or Defendant Mitch Brown, then Defendant Cyclebar was how Defendant XPOF controlled employees of franchisees using the rights secured by the franchise agreements.

52.     Defendant Cyclebar Franchising SPV, LLC ("Defendant Cyclebar SPV") is a limited liability company that formed in the State of Delaware and has its principal place of business in Orange County, California.  As noted, it succeeded Defendant Cyclebar in offering Cyclebar-branded studios as franchises for Xponential Fitness.  To the extent Defendant

Cyclebar SPV was the one who entered into franchise agreements with Defendant MD Pro Fitness LLC and/or Defendant Mitch Brown, then Defendant Cyclebar SPV was how Defendant XPOF controlled employees of franchisees using the rights secured by the franchise agreements.

53. Defendant PB Franchising, LLC ("Defendant PB") is a limited liability company that formed in the State of Delaware and has its principal place of business in Orange County, California. Defendant PB is a wholly owned subsidiary of Defendant XPOF. It was the company that offered Pure Barre-branded studios as franchises for Xponential Fitness. In March of 2023, it was then succeeded by Defendant PB Franchising SPV, LLC, who became the new entity offering Pure Barre-branded studios as franchises for Xponential Fitness. Even after Defendant PB was succeeded by this new entity, it also operated Pure Barre studios repurchased from franchisees for purposes of resale to new franchisees such as Defendant MD Pro Fitness, LLC and Defendant Mitch Brown. To the extent Defendant PB was the one who entered into franchise agreements with Defendant MD Pro Fitness LLC and/or Defendant Mitch Brown, then Defendant PB was how Defendant XPOF controlled employees of franchisees using the rights secured by the franchise agreements.

54. Defendant PB Franchising SPV, LLC ("Defendant PB SPV") is a limited liability company that formed in the State of Delaware and has its principal place of business in Orange County, California. As noted, it succeeded Defendant PB in offering Pure Barre-branded studios as franchises for Xponential Fitness. To the extent Defendant PB SPV was the one who entered into franchise agreements with Defendant MD Pro Fitness LLC and/or Defendant Mitch Brown, then Defendant PB SPV was how Defendant XPOF controlled employees of franchisees using the rights secured by the franchise agreements.

17

55. Defendant Row House Franchise, LLC ("Defendant RH") is a limited liability company that formed in the State of Delaware and has its principal place of business in Orange County, California. Defendant RH is a wholly owned subsidiary of Defendant XPOF. It was the company that offered Row House-branded studios as franchises for Xponential Fitness. In March of 2023, it was then succeeded by Defendant Row House Franchise SPV, LLC, who became the new entity offering Row House-branded studios as franchises for Xponential Fitness. However, even after Defendant RH was succeeded by this new entity, it also operated Row House studios repurchased from franchisees for purposes of resale to new franchisees such as Defendant MD Pro Fitness, LLC and Defendant Mitch Brown. To the extent Defendant RH was the one who entered into franchise agreements with Defendant MD Pro Fitness LLC and/or Defendant Mitch Brown, then Defendant RH was how Defendant XPOF controlled employees of franchisees using the rights secured by the franchise agreements.

56. Defendant Row House Franchise SPV, LLC ("Defendant RH SPV") is a limited liability company that formed in the State of Delaware and has its principal place of business in Orange County, California. As noted, it succeeded Defendant RH in offering Row House-branded studios as franchises for Xponential Fitness. To the extent Defendant RH SPV was the one who entered into franchise agreements with Defendant MD Pro Fitness LLC and/or Defendant Mitch Brown, then Defendant RH SPV was how controlled employees of franchisees using the rights secured by the franchise agreements.

57. Defendant Stride Franchise, LLC ("Defendant Stride") is a limited liability company that formed in the State of Delaware and has its principal place of business in Orange County, California. Defendant Stride is a subsidiary of Defendant XPOF. It was the company that offered Stride-branded studios as franchises for Xponential Fitness. In March of 2023, it

was then succeeded by Defendant Stride Franchise SPV, LLC, who became the new entity offering Stride-branded studios as franchises for Xponential Fitness. Even after Defendant Stride was succeeded by this new entity, it also operated Stride studios repurchased from franchisees for purposes of resale to new franchisees such as Defendant MD Pro Fitness, LLC and Defendant Mitch Brown. To the extent Defendant Stride was the one who entered into franchise agreements with Defendant MD Pro Fitness LLC and/or Defendant Mitch Brown, then Defendant Stride was how Defendant XPOF controlled employees of franchisees using the rights secured by the franchise agreements.

58. Defendant Stride Franchise SPV, LLC ("Defendant Stride SPV") is a limited liability company that formed in the State of Delaware and has its principal place of business in Orange County, California. As noted, it succeeded Defendant Stride in offering Stride-branded studios as franchises on behalf of Xponential Fitness. To the extent Defendant Stride SPV was the one who entered into franchise agreements with Defendant MD Pro Fitness LLC and/or Defendant Mitch Brown, then Defendant Stride SPV was Defendant XPOF controlled employees of franchisees using the rights secured by the franchise agreements.

59. Defendant Yoga Six Franchise, LLC ("Defendant Yoga Six") is a limited liability company that formed in the State of Delaware and has its principal place of business in Orange County, California. Defendant Yoga Six is a subsidiary of Defendant XPOF. It was the company that offered Yoga Six-branded studios as franchises for Xponential Fitness. In March of 2023, it was then succeeded by Defendant Yoga Six Franchise SPV, LLC, who became the new entity offering Yoga Six-branded studios as franchises for Xponential Fitness. Even after Defendant Yoga Six was succeeded by this new entity, it also operated Yoga Six studios repurchased from franchisees for purposes of resale to new franchisees such as Defendant MD

Pro Fitness, LLC and Defendant Mitch Brown. To the extent Defendant Yoga Six was the one who entered into franchise agreements with Defendant MD Pro Fitness LLC and/or Defendant Mitch Brown, then Defendant Yoga Six was how employees of Defendant XPOF controlled employees of franchisees using the franchise agreements.

60. Defendant Yoga Six Franchise SPV, LLC ("Defendant Stride SPV") is a limited liability company that formed in the State of Delaware and has its principal place of business in Orange County, California. As noted, it succeeded Defendant Yoga Six in offering Yoga Six-branded studios as franchises for Xponential Fitness. To the extent Defendant Yoga Six SPV was the one who entered into franchise agreements with Defendant MD Pro Fitness LLC and/or Defendant Mitch Brown, then Defendant Yoga Six SPV was how Defendant XPOF controlled employees of franchisees using the rights secured by the franchise agreements.

**2. The MD Pro Fitness Defendants**

61. Defendant MD Pro Fitness, LLC ("Defendant MDPro") is a for-profit limited liability company that formed in the State of Delaware and has its principal place of business in Snohomish County, Washington. It is the operating company of Defendant Mitch Brown that directly employed Plaintiffs, and the members of the putative classes, after the sixty-six studios owned and operated by Xponential Fitness were refranchised on or about September 1, 2023.

62. Defendant Mitch Brown ("Defendant Brown") is a natural person who is a resident of Snohomish County, Washington. He owned and operated Defendant MDPro. Additionally, once he purchased the sixty-six studios owned and operated by Xponential Fitness as new franchises, he was directly responsible for deciding whether, and how, to pay all employees of those studios.

## IV.    FACTS

**A.    The Franchising Model of Xponential Fitness**

63.    Xponential Fitness is in the boutique fitness industry, which focuses on specific exercise concepts that appeal to certain segments of the market.  For instance, AKT is a dance-based cardio concept.  CycleBar is an indoor cycling concept.  Pure Barre is a strength, cardio, and flexibility concept.  Row House is an indoor rowing concept.  Yoga Six is a yoga concept. Each studio is necessarily singularly focused on its specific concept, is limited in size, and is designed to foster a community consisting of a smaller group of people.

64.    Xponential Fitness is a publicly traded company that had its initial public offering as the stock ticker "XPOF" on July 23, 2021.  Over the years, Xponential Fitness acquired the rights to ten different brands in the boutique fitness industry.  Those brands are AKT, BFT, Club Pilates, CycleBar, PureBarre, Row House, Rumble, Stretch Lab, Stride, and Yoga Six.

65.    Xponential Fitness' business model is that of a franchisor.  It profits by selling local franchises for its brands to franchisees.  The franchisee owns and operates a gym studio under one of these brands, pays various franchise fees to Xponential Fitness for the right to do so, and ostensibly profits from the brand's goodwill that leads clients to become paying members at the gym studio.

66.    Xponential Fitness accomplishes this goal by entering into a franchise agreement. All franchise agreements for the brands at issue in this case are incredibly oppressive for the franchisee, and they achieve total control over a franchisee and its employees.

67.    The franchise agreements for the brands at issue in this case—namely, AKT, CycleBar, Pure Barre, Row House, Stride, and Yoga Six—give Xponential Fitness the following rights of control over the franchisee and its employees:

a. Xponential Fitness has the right to approve the exact location of the franchisee's gym studio. Xpontential Fitness even reserves the right to charge the franchisee a fee if it must perform an on-site evaluation of the proposed location.

b. Xponential Fitness has the right to approve or reject any lease agreement for the property on which the franchisee wants to operate the gym studio. Additionally, the franchisee is required to use a retail real estate attorney selected by Xponential Fitness to review and negotiate the lease for the gym studio.

c. Xponential Fitness has the right to dictate the terms that the franchisee must obtain in any lease agreement for the property on which the franchisee wants to operate the gym studio.

d. The franchisee must always comply with the operating manual, standards, operating systems, and other aspects of the brand that are set by Xponential Fitness, and which can be changed at any time at Xponential Fitness' sole discretion.

e. The franchisee, each time it renews, must sign a general release of all claims against Xponential Fitness' companies, officers, directors, employees, and agents.

f. The franchisee, each time it renews, must renovate or modernize the gym studio location, including the interior or exterior of the building, grounds, leasehold improvements, signs, furnishings, fixtures, equipment, surveillance cameras, and décor as Xponential Fitness determines in its sole discretion.

g. Xponential Fitness has the right to dictate to the franchisee, prior to the opening of the gym studio and at any time thereafter, what furniture, fixtures, and equipment it must purchase.

h.     Xponential Fitness has the right to dictate to the franchisee, prior to the opening of the gym studio and at any time thereafter, what retail inventory it must stock for purchase by its customers.

i.     Xponential Fitness has the right to dictate to the franchisee, prior to the opening of the gym studio and at any time thereafter, what accounting, cost control, and point-of-sale systems and software it must purchase and use.

j.     Xponential Fitness requires the owner and its managers to complete initial, ongoing, refresher, or remedial training provided by corporate employees.  The content and necessity of the training is set by Xponential Fitness in its sole discretion.

k.     Xponential Fitness requires the franchisee's instructors or coaches to attend and complete initial, ongoing, refresher, or remedial training provided by corporate employees.  The content and necessity of the training is set by Xponential Fitness in its sole discretion.

l.     Xponential Fitness has the right to dictate to the franchisee the "proper display" of the brand marks in the gym studio, and the layout and design of the gym studio, its equipment, furniture, fixtures, surveillance cameras with audio, and inventories.  Xponential Fitness can even dictate to the franchisee's architect any layout or design modifications of the physical property that must take place.

m.     Xponential Fitness has the right to dictate to the franchisee what distributors and suppliers it must use, what services and products it must use, and what specific materials and supplies it must use.

n.     Xponential Fitness has the right to dictate to the franchisee what prices it must charge for any product or service the franchisee offers at the gym studio.

o.      Xponential Fitness requires the franchisee to have surveillance cameras with audio purchased from, and installed at the gym studio by, a supplier approved by the company.  Xponential Fitness then requires the franchisee to make the surveillance camera footage and audio available to Xponential Fitness to review remotely using the Internet at any time in its sole discretion so it can monitor the franchisee's employees and customers.  Additionally, the franchisee must indemnify Xponential Fitness if a customer sues Xponential Fitness for invasion of privacy due to the surveillance cameras.

p.      Xponential Fitness has the right to inspect any franchisee's gym studio at any time, without prior notice, to ensure the franchisee is complying with its obligations under the franchise agreement.  Xponential Fitness also has the right to interview the franchisee's employees or customers to ensure compliance with the obligations.

q.      Xponential Fitness has the right to inspect, copy, and audit the franchisee's financial records, books, papers, sales records, purchase records, receipts, accounting ledgers, and person or business tax returns.

68.     The franchise agreements for the brands at issue in this case—namely, AKT, CycleBar, Pure Barre, Row House, Stride, and Yoga Six—give Xponential Fitness the right to charge the following types of franchise fees:

a.      Xponential Fitness charges the franchisee an initial franchise fee of tens of thousands of dollars simply to acquire the franchise.

b.      Xponential Fitness charges the franchisee a royalty consisting of a percentage of gross sales that is payable weekly and without a setoff, credit, or deduction for amounts owed by Xponential Fitness to the franchisee.  These fees are automatically debited from the point-of-sale system selected by Xponential Fitness.

c.      Xponential Fitness charges the franchisee a percentage of gross sales to be deposited in a "fund" that exists to promote the brand.

d.      Xponential Fitness charges the franchisee a technology fee for website development and hosting, a brand-wide intranet or internal portal, proprietary or customized software for the brand, and any other technology that Xponential Fitness determines is necessary for the franchisee in its sole discretion.

e.      Xponential Fitness charges the franchisee for the cost of training franchise owners, their managers, and their instructors for initial, ongoing, refresher, or remedial training provided by corporate employees.

69.      The franchise agreements for the brands at issue in this case—namely, AKT, CycleBar, Pure Barre, Row House, Stride, and Yoga Six—also require franchisees to "strictly comply" with an operating manual for each brand.  The manual sets mandatory specifications, standards, and operating procedures that the franchisee and its employees must follow.  Specifically, below are some examples of the mandates in the operating manuals:

a.      The operating manual tells the franchisee and its employees how to engage in risk management with respect to handling of cash, cameras, doors, spills, lifting, emergency care, incident reports, and natural disasters.

b.      The operating manual sets "operational standards" for the franchisee and its employees.  These operational standards address mandatory hours of operation, studio cleanliness and maintenance standards, required holiday décor, mandatory signs and marketing, a required studio code of conduct for clients that must be enforced by employees, a required studio code of conduct for employees themselves, a mandatory

dress code for employees, mandatory persona hygiene and appearance standards for employees, and required service standards for employees.

        c.     The operating manual also dictates to franchise employees what approved classes can be offered and sets the music and playlist standards.

        d.     The operating manual requires franchisee employees to follow Xponential Fitness' cancellation fee policies, no-show fee policies, waitlist policies, advanced booking policies, membership cancellation policies, and membership freeze policies.

        e.     The operating manual also addresses various topics under the heading "Labor Force." It discussed labor laws and requirements for franchisees, sets standards for job descriptions, studio staffing best practices, recruiting activities, sharing instructors among franchised studios, and sets onboarding and training policies for a franchisee's employees.

        f.     The operating manual requires franchisee employees to follow Xponential Fitness' policies on client communications, and on handling complaints from clients. It also addresses daily studio operations.

70.     Finally, if a franchisee fails to strictly comply with the franchise agreement or the operating manual, then Xponential Fitness can terminate the franchise. Xponential Fitness uses this right of termination to enforce its total control of the franchisee and its employees.

71.     The contractual right to enforce the terms of an Xponential Fitness franchise agreement and operating manual lies with its franchising limited liability companies, which are subsidiaries of Defendant XPOF.

72.     Before April of 2023, the relevant subsidiaries here were Defendant AKT, Defendant Cyclebar, Defendant PB, Defendant RH, Defendant Stride, and Defendant Yoga Six

(collectively, the "XPOF Franchising Entities"). As of April of 2023, Xponential Fitness started using the XPOF SPV Franchising Entities. However, Xponential Fitness disclosed that, for studios it repurchased from failing franchisees, it did so with the XPOF Franchising Entities who would then refranchise the studios to new franchisees.

73. Given these disclosures, upon information or belief, the XPOF Franchising Entities were the subsidiaries that entered into franchise agreements with Defendant MDPro and Defendant Brown and therefore exercised the rights of control that make them joint employers. Alternatively, however, Plaintiffs have also sued the XPOF SPV Franchising Entities to the extent they were the subsidiaries that entered into the franchise agreements with Defendant MDPro and Defendant Brown and therefore became joint employers.

74. Employees of Defendant XPOF—referred to as "corporate employees"—are the employees of Xponential Fitness who exercise the control held by the XPOF Franchising Entities and the XPOF SPV Franchising Entities.

**B.      The Mechanics of a Franchise Deal With Xponential Fitness**

75. Federal law requires certain disclosures by franchisors to potential franchisees. Additionally, several states—including states at issue in this lawsuit—have laws requiring additional disclosures. One of these additional disclosures is to identify the employees of Xponential Fitness that sell franchises in the state.

76. Based upon state-law disclosures that Xponential Fitness has made, those employees who sell its franchises are in Cincinnati, Ohio. They are the following:

a.      Emily Brown, who is the Vice President of Franchise Development at Xponential Fitness, working in Cincinnati, Ohio.

b.      Rachel Engel, who is a Manager of Franchise Development Relationships at Xponential Fitness, working in Cincinnati, Ohio

c.      Sarah Nolan, who is a Franchise Development Coordinator at Xponential Fitness, working in Cincinnati, Ohio.

d.      Erica Apted Covey, who is a Franchise Development Coordinator at Xponential Fitness, working in Cincinnati, Ohio.

77.      As a result, Xponential Fitness' key franchise selling operations are in Cincinnati, Ohio.  Every franchise deal that Xponential Fitness concludes is sold through the State of Ohio.

**C.      The Franchise Deal Between Xponential Fitness and Mitch Brown**

78.      Defendant Brown lives and works in the State of Washington.  Before September 1, 2023, he owned and operated a handful of franchised Pure Barre gym studios in the State of Minnesota under his company Defendant MDPro.

79.      At some point before September 1, 2023, Defendant Brown began discussions with Xponential Fitness about expanding the number of his franchised gym studios.

80.      According to Anthony Geisler, the founder and Chief Executive Officer of Xponential Fitness, Defendant Brown wanted to purchase franchises for all gym studios that were, at that point in time, owned and operated by Xponential Fitness.

81.      According to Anthony Geisler, the founder and Chief Executive Officer of Xponential Fitness, the company was being urged by investors to refranchise the company-owned gym studios because those studios were losing money at a rate of approximately $1,000,000 per month.

82.      According to Anthony Geisler, the founder and Chief Executive Officer of Xponential Fitness, the company agreed to refranchise sixty-six company-owned gym studios to

Defendant Brown and his company Defendant MDPro. These studios employed over 800 people and consisted of the following brands: AKT, CycleBar, PureBarre, Row House, Stride, and Yoga Six. They also spanned several states, including Arizona, California, Colorado, Florida, Georgia, Illinois, Kansas, Michigan, Minnesota, New Mexico, New York, North Dakota, Ohio, South Carolina, Texas, Virginia, and Wisconsin.

83.     Those sixty-six company-owned gym studios were previously franchised but the franchisees who owned and operated them had failed. Rather than close the gym studios, Xponential Fitness repurchased them from the failed franchisee for pennies on the dollar and then operated them at a loss. For some of these repurchased gym studios, however, the local employees would work to increase their membership so the studios could become profitable.

84.     At the time Xponential Fitness agreed to refranchise the sixty-six company-owned gym studios to Defendant Brown, very few of them were profitable even as company-owned studios that did not have to pay franchise fees. Specifically, according to Anthony Geisler, the founder and Chief Executive Officer of Xponential Fitness, "a lot of the studios that Mitch took over were close to being in the black, but did he get some duds? Yeah, he did."

85.     According to Anthony Geisler, the founder and Chief Executive Officer of Xponential Fitness, the company allegedly "stringently vetted" Defendant Brown before agreeing to refranchise sixty-six company-owned gym studios to him. Based upon what happened after this franchise deal, that seems highly unlikely.

**D.     The Franchise Deal Ends in Disaster**

86.     If most of the sixty-six company-owned gym studios being refranchised to Defendant Brown were unprofitable without having to pay franchise fees, then any reasonable person could have predicted that this franchising deal would end in disaster.

87.     Specifically, the sixty-six company-owned gym studios had over 800 employees across at least seventeen states.  Onboarding and managing that many employees in that many states was a massive undertaking.  Furthermore, turning them into, collectively, a profitable enterprise would be a monumental task for anyone no matter how skilled in business.

88.     In fact, Defendant Brown had only a small management team working with him.  There was Jackson Baltz who was Vice President.  There was Jess Rosen, who was Chief Operating Officer.  There was Glenna Bongcaron, who held some kind of human resources role.  There was Kylie Belville.  And there was Breanna Lentz.

89.     Regardless, as of September 1, 2023, Xponential Fitness refranchised the sixty-six company-owned gym studios to Defendant Brown, and all employees of these gym studios, who were previously employees of Defendant XPOF, became employees of Defendant MDPro.

90.     There were problems almost immediately.  Right from the start, Defendant Brown and his team did not properly onboard all 800 or so employees.  Many went without any pay for certain workweeks or with incorrect pay.  For instance:

        a.      Plaintiff Curry, an instructor at the AKT studio located in Powell, Ohio did not receive any pay for the workweek of September 10, 2023 through September 16, 2023 and for the workweek of September 17, 2023 through September 23, 2023.

        b.      Plaintiff Brennan, a coach at the Row House studio in Plain City, Ohio, did not receive the correct amount of pay for any workweeks.

        c.      Plaintiff Fernandez, who worked as a general manager and instructor at the Yoga Six studio in Toledo, Ohio, did not receive her manager salary until October 25, 2023, when she was paid some but not all of it.  She also did not receive any overtime to which she was entitled despite working over forty hours.

d.      Plaintiff Kirkpatrick, who worked as an instructor at the Pure Barre studio in La Jolla, California, did not receive her correct pay for some of her paychecks.

e.      Plaintiff Bell, who worked as the general manager of the AKT studio in Coral Springs, Florida, found that her staff's pay was often late, none of her staff were paid the correct hourly wage or class piece rate, and some of her staff were not paid at all.

f.      Plaintiff Ruyter, who worked as the sales manager and acting general manager of the Row House studios in Oviedo, Florida and Winter Park, Florida, was paid late.  She also did not receive overtime despite working over forty hours in a workweek, despite her job being non-exempt from overtime under federal and state law, and despite previously being paid overtime by Defendant XPOF prior to the refranchising.

g.      Plaintiff Crowley, who worked as the general manager of the Stride studio in Jacksonville, Florida, never received a paycheck on the date it was due.

h.      Plaintiff Dickey, who worked as the sales manager at the Row House studio in Roswell, Georgia, was never paid her commissions.

i.      Plaintiff Eggleston, who worked as a coach at the Row House studio in Beverly Hills, Michigan, did not receive any pay for the workweek of September 10, 2023 through September 16, 2023 and for the workweek of September 17, 2023 through September 23, 2023.

j.      Plaintiff Weinert, who worked as lead instructor at the CycleBar studio in Bloomfield Hills, Michigan, did not receive any hourly pay in September of 2023.

k.      Plaintiff Thureen, who worked as an instructor and as the acting sales manager at the Pure Barre studio in Apple Valley, Minnesota, never received her correct overtime rate because it never accounted for both her hourly rate and her class piece rate.

31

l.      Plaintiff Smith, who worked as lead instructor at the CycleBar studio in Mount Pleasant, South Carolina, did not receive her class piece rate in her first paycheck.

m.      Plaintiff Bourquein, who worked as lead instructor at the AKT studio in Plano, Texas, never received her paychecks on time.

91.     While Xponential Fitness represents to the public that any new franchisee must have, per gym studio, at least $100,000 in liquid assets and at least $500,000 in net wealth, it seems highly unlikely that Defendant Brown and his company Defendant MDPro had anywhere near the necessary liquid assets to properly run sixty-six gym studios.

92.     According to Anthony Geisler, the founder and Chief Executive Officer of Xponential Fitness, Defendant Brown could not afford the first payroll due on September 15, 2023, so he asked Xponential Fitness to wire him $600,000.  It did, and Defendant Brown used the money to pay the employees of his sixty-six gym studios now employed by Defendant MDPro.  Nevertheless, some employees did not receive any, or the proper, pay on September 15, 2023, including the federal or state minimum wage or required overtime pay.

93.     According to Anthony Geisler, the founder and Chief Executive Officer of Xponential Fitness, Defendant Brown could not afford the second payroll due on September 29, 2023, so he asked Xponential Fitness to wire him $700,000.  It did, and Defendant Brown used the money to pay the employees of his sixty-six gym studios now employed by Defendant MDPro.  Nevertheless, some employees did not receive any, or the proper, pay on September 29, 2023, including the federal or state minimum wage or required overtime pay.

94.     According to Anthony Geisler, the founder and Chief Executive Officer of Xponential Fitness, Defendant Brown could not afford the third payroll due on October 13, 2023, so Xponential Fitness suspended his royalties.  This allowed Defendant Brown to pay some

employees with the money he saved.  Furthermore, as part of the deal with Defendant Brown, Xponential Fitness agreed to pay the rent on all the leases for the gym studios for a year.  Despite these special allowances to Defendant Brown, some employees did not receive any, or the proper, pay on October 13, 2023.  This led to some employees not being paid the federal or state minimum wage or proper overtime pay.  For instance:

        a.       Plaintiff Fernandez, who worked as a general manager and instructor at the Yoga Six studio in Toledo, Ohio, did not receive her manager salary until October 25, 2023, when she was paid some but not all of it.  She also did not receive any overtime to which she was entitled despite working over forty hours.

        b.       Plaintiff Cercello, who worked as a front desk associate at the Row House studio in Naperville, Illinois, did not receive any pay for hours worked from October 1, 2023 until the studio closed.

        c.       Plaintiff Carey, who worked as an instructor at the Pure Barre studio in Deerfield, Illinois, did not receive all the pay to which she was entitled for her hours worked during the workweek of September 24, 2023, through September 30, 2023 and for the workweek of October 1, 2023 through October 7, 2023.

        d.       Plaintiff Eggleston, who worked as a coach at the Row House studio in Beverly Hills, Michigan, did not receive any pay for the workweek of September 24, 2023, through September 30, 2023 and for the workweek of October 1, 2023 through October 7, 2023.

        e.       Plaintiff Weinert, who worked as the lead instructor at the CycleBar studio in Bloomfield Hills, Michigan, did not receive any hourly pay for the workweek of

September 24, 2023, through September 30, 2023 and for the workweek of October 1, 2023 through October 7, 2023.

      f.    Plaintiff Scott, who worked as a front desk associate and instructor at the Pure Barre studio in Apple Valley, Minnesota, received her paycheck six days late on October 19, 2023.

      g.    Plaintiff Lounsbery, who worked as the general manager and as an instructor at the Pure Barre studio in Williamsburg, Virginia, did not receive all overtime pay for her hours worked during the workweek of September 24, 2023, through September 30, 2023 and for the workweek of October 1, 2023 through October 7, 2023. Her hours were also edited by someone in the ADP electronic system to reduce the number of overtime hours.

95.    On the next pay period of October 27, 2023, some employees did not receive any, or the proper, pay from Defendant MDPro. This led to some employees not being paid the federal or state minimum wage or proper overtime pay. For instance:

      a.    Plaintiff Fernandez, who worked as a general manager and instructor at the Yoga Six studio in Toledo, Ohio, did not receive her manager salary until October 25, 2023, when she was paid some but not all of it. She also did not receive any overtime.

      b.    Plaintiff Kirkpatrick, who worked as an instructor at the Pure Barre studio in La Jolla, California, received no pay for the workweek of October 8, 2023 through October 14, 2023 and for the workweek of October 15, 2023 through October 21, 2023.

      c.    Plaintiff Edwards-Moody, who worked as an instructor at the AKT studio in Inman Park in Atlanta, Georgia, received the incorrect hourly rate and half of the pay was missing.

d.      Plaintiff Dickey, who worked as the sales manager at the Row House studio in Roswell, Georgia, did not receive pay for 16.5 hours she worked during the workweek of October 8, 2023 through October 14, 2023 and the workweek of October 15, 2023 through October 21, 2023.

e.      Plaintiff Cercello, who worked as a front desk associate at the Row House studio in Naperville, Illinois, did not receive any pay for hours worked from October 1, 2023 until the studio closed.

f.      Plaintiff Carey, who worked as an instructor at the Pure Barre studio in Deerfield, Illinois, did not receive all the pay to which she was entitled for her hours worked during the workweek of October 8, 2023 through October 14, 2023 and the workweek of October 15, 2023 through October 21, 2023.

g.      Plaintiff Murrell, who worked as the sales manager at the AKT studio in Leawood, Kansas, did not receive any pay for the workweek of October 8, 2023 through October 14, 2023 and the workweek of October 15, 2023 through October 21, 2023.  This included not receiving overtime pay for hours worked over forty in the workweeks.

h.      Plaintiff Hase, who worked as the general manager and lead instructor at the CycleBar studio in Fargo, North Dakota, did not receive her overtime pay for the workweek of October 8, 2023 through October 14, 2023 and the workweek of October 15, 2023 through October 21, 2023.

i.      Plaintiff Vitulli, who worked as the general manager of the CycleBar studio in Houston, Texas, received no pay for the workweek of October 8, 2023 through October 14, 2023 and the workweek of October 15, 2023 through October 21, 2023.

j.      Plaintiff Lounsbery, who worked as general manager and as an instructor at the Pure Barre studio in Williamsburg, Virginia, did not receive all overtime pay for her hours worked during the workweek of October 8, 2023 through October 14, 2023 and the workweek of October 15, 2023 through October 21, 2023.  Her hours were also edited by someone in the ADP electronic system to reduce the number of overtime hours.

96.      On the next pay period of November 10, 2023, and continuing to the present, none of the over 800 employees at any of the sixty-six franchised studios received any pay at all despite working hours, in some cases over forty hours, in a workweek.  This led to employees not being paid the federal or state minimum wage or proper overtime pay.

**E.      Mitch Brown Disappears and Stops All Communication**

97.      In late October and early November of 2023, instructors and coaches at the sixty-six franchised gym studios started quitting or refusing to work because they were not being paid.  Managers then had to cancel classes due to the lack of instructors or coaches, and customers who had purchased memberships became angry.  Defendant Brown and his management team also were not restocking retail items or even necessities such as toilet paper for customer restrooms.  As a result, some of the managers had to purchase those items themselves.

98.      Frustrated, the managers at the sixty-six franchised gym studios were sending e-mails to Defendant Brown and his management team about the situation.  The managers were asking for guidance and assistance, but Defendant Brown and his management team would not respond or ignored them.

99.      On November 8, 2023, Defendant Brown finally responded by sending an e-mail to all the managers at his sixty-six franchised gym studios.  The e-mail was cryptic and odd, did not inspire confidence, and read as follows:

From: Mitch Brown <m.brown@purebarre.com>
Date: Wed, Nov 8, 2023 at 5:59 PM
Subject: MDPro
To: Mitch Brown <m.brown@purebarre.com>

To Everyone who blindly put your faith in me.

To Everyone who trusted my company.

To Everyone who has had their lives disrupted.

To Everyone who believes I am the Devil himself.

To Everyone. Just Everyone.

Ten thousand versions of truth out there. None of them completely true. Not even mine. People LIe. People Suck. But moving forward I promise to fight. My entire life is dumped into this. We fail, I am bk. Truth. . To me that doesn't matter because when I became an employer I promised to pay my employees on time.
.

No apologies. There has been a myriad of errors in attempting this acquisition of 68 under performing stores from our franchisor. I accept, recognize and will burden this debacle for the rest of my life. EXPO and MDPro are partners in all stores but I place no direct blame on or towards EXPO.

The emails filled with hatred, exorcism, and just plain meanness are also my burden to carry. In my world of worlds I couldn't fathom a worse situation. The only thing I will say is this, I know I am good people, I am trying.I am human. Doesn't matter what my issues are, I FAILED ALL OF YOU. My entire team left when the going got tough. A rightful decision they made based on many circumstances.

But I am still here, fighting as best I can. I will figure out to get everyone paid.

Not any one email can be filled with more malice than my feelings of pure disappointment in myself. I had partners in this venture to accomplish something never done before. Regardless of the misunderstandings, excuses, finger pointing, and whatever else, THIS IS MY BURDEN TO CARRY.

Long overdue. For sure.

Not enough answers. For sure.

Unfair to any employee of mine. For sure.

Real life shit. For sure.

None of these get you paid. Keep studios open. Shield clients from real life.

One thing I know for sure is this hurts to my core. No matter the end result, I WILL ENSURE ANY/EVERY EMPLOYEE THAT IS OWED MONEY WILL GET PAID AS TIMELY AS POSSIBLE.

So many versions of this/my venture into acquiring company stores. So enough words Actions will be slow, my apologies.

A bunch more emails with hatred won't help.

Emails with solutions short term, accepted.

Talk soon

100.     A true and accurate copy of Defendant Brown's e-mail sent on November 8, 2023 is attached as Exhibit 1 to this Complaint.

101.     As the e-mail from Defendant Brown indicates, his entire management team quit, which is why they were not responding to any e-mails or telephone calls from the frustrated managers at the sixty-six franchised gym studios.  Additionally, Defendant Brown's e-mail confirms that the gym studios were considered "underperforming" assets sold by Xponential Fitness.  Defendant Brown even called the mass-franchising deal a "debacle."

102.     Following this e-mail on November 8, 2023, the managers at the sixty-six franchised gym studios continued to hear nothing in response to their e-mails and telephone calls to Defendant Brown.

103.     On November 10, 2023, Defendant Brown responded by sending another e-mail to all managers at his sixty-six franchised gym studios.  The e-mail was also cryptic and odd, and read as follows:

From: **Mitch Brown**
<m.brown@purebarre.com> Date:
Fri, Nov 10, 2023 at 2:34 PM
Subject: Re: MDPro
To: Mitch Brown <m.brown@purebarre.com>

Obviously today was another day of disappointment, anger, hatred, all of it deserved.
The severity of the current situation on payroll is unacceptable. And again I will reiterate that I will accept ALL responsibility regardless of circumstances.
This project needed cash flow to build these orphaned studios into a profitable conglomerate with benefits, 401k all for everyone.
Our financing model was created from information  that was limited and incomplete. Financing was delayed, as you all know it delayed transition.
Again these are all excuses, not valid reasons to anyone. Every single day I am trying, I promise.

Quite a few of you have reached out offering assistance. THANK YOU.  Please retext your message to the top of my list.

104.    A true and accurate copy of Defendant Brown's e-mail sent on November 10, 2023 is attached as Exhibit 2 to this Complaint.

105.    The date of November 10, 2023, was a regular payroll day.   As the e-mail from Defendant Brown references, none of the over 800 employees of the sixty-six franchised gym studios received any pay, including overtime pay.  Defendant Brown goes on to blame "limited and incomplete" information causing him to not obtain the financing he needed to "build these orphaned studios into a profitable conglomerate."

106.    Following this e-mail on November 10, 2023, the managers at the sixty-six franchised gym studios continued to hear nothing in response to their e-mails and telephone calls to Defendant Brown

107.    On November 13, 2023, Defendant Brown once again responded only by sending the following e-mail to all the managers at his sixty-six franchised gym studios:

From: Mitch Brown <m.brown@purebarre.com>
Date: Mon, Nov 13, 2023 at 11:29 AM
Subject: Re: MDPro
To: Mitch Brown <m.brown@purebarre.com>

I have read through all of the emails and texts. The pain inflicted on all of you can't be repaired. I will continue to fight to get things aligned, people paid, incentives package,
Many of you have offered to assist, I am working through that as well. I have a couple meetings this morning and with corporate today.
There will be an email update this afternoon, before 4pm PST.

108.    A true and accurate copy of Defendant Brown's e-mail sent on November 13, 2023 is attached as Exhibit 3 to this Complaint.

109.    As the e-mail from Defendant Brown references, he was supposed to have a meeting with Xponential Fitness' management on November 13, 2023 to discuss how to salvage

this "debacle." However, as Anthony Geisler would later admit, that meeting did not happen. Instead, Defendant Brown disappeared and stopped responding to text messages.

**F.      The Collapse of the Sixty-Six Franchised Gym Studios**

110.    Meanwhile, as Defendant Brown had his entire management team quit on him, disappeared, stopped communicating with anyone, and sent odd and cryptic e-mails, the managers at the gym studios were left to fend for themselves.

111.    They were not being paid as they continued to work, with many working more than forty hours in these workweeks. Not only had Defendant Brown encouraged them to continue working for no pay, various corporate employees of Xponential Fitness did as well. Defendant Brown and these corporate employees also encouraged the managers not to freeze or cancel any gym memberships and to ask their instructors and coaches to work for no pay.

112.    But because the instructors and coaches were not being paid, many refused to work. Others just quit. As a result, the managers had no choice but to cancel classes. At that point, customers complained, with many asking to freeze or cancel their memberships. When managers did as customers requested, Defendant Brown and/or Xponential Fitness locked some of them out of the membership management software so they could not freeze or cancel any other memberships despite the lack of classes.

113.    Between the end of October of 2023 through the middle of November of 2023, these problems led many of the sixty-six gym studios to close their doors. Some of the gym studios continue to operate as of the date this case is filed, but they nevertheless set final dates to close their doors. To not completely foreclose a reopening, the managers generally told members that the gym studios were "temporarily closed due to unforeseen circumstances."

**G.      Mitch Brown Resurfaces and Meets with Xponential Fitness**

114.    Eventually Defendant Brown resurfaced.  Xponential Fitness flew him to Los Angeles to meet with Mr. Geisler and other company executives.  The purpose of the meeting was to formulate a plan for how to address the "debacle" that resulted from the refranchising of these sixty-six gym studios to Defendant Brown and his company Defendant MDPro.

115.    On November 17, 2023, Defendant Brown, Anthony Geisler, and other executives of Xponential Fitness met.  Mr. Geisler proposed selling some of the sixty-six gym studios to new franchisees and closing the remaining gym studios.

116.    Even now, as this case is filed, there are employees at the sixty-six franchised gym studios that continue to work for no pay.

**H.      The Failure to Pay For Class Preparation or Training Time**

117.    Both before and after Xponential Fitness franchised the sixty-six gym studios, Defendants failed to credit instructors or coaches for time spent preparing for class.

118.    For instructors at AKT, this preparation time included learning new choreography that Xponential Fitness published quarterly.  For instance, Plaintiff Bourquein, who worked as lead instructor at the AKT studio in Plano, Texas, was told she could only clock in and receive pay for one hour when learning new choreography.  However, it took her multiple hours to learn it.  Had Plaintiff Bourquein been credited with all hours worked learning new choreography, she would have worked over forty hours in the workweek and been entitled to overtime pay.  She never received that overtime pay, despite working excess hours.

119.    For instructors at Pure Barre, this preparation time included learning new choreography that Xponential Fitness published quarterly.  For instance, Plaintiff Twiddy, who worked as lead instructor at the Pure Barre studio in Williamsburg, Virginia, was never paid for

the multiple hours necessary to learn this new choreography. Had Plaintiff Twiddy been credited with all hours spent learning new choreography, she would have worked over forty hours in the workweek and been entitled to overtime pay. She never received that overtime pay, despite working excess hours. The same was true for Plaintiff Lounsbery.

120. For coaches at Row House, this preparation time included designing classes. For instance, Plaintiff Ruyter, who worked as the sales manager and acting general manager of the Row House studios in Oviedo, Florida and Winter Park, Florida, observed her instructors not being paid for time spent designing classes. For years, Plaintiff Ruyter had been arguing with Defendant XPOF that it should be paying coaches for this time, but Defendant XPOF refused. Had these Row House coaches been credited with all hours worked designing classes, many would have worked over forty hours in the workweek and been entitled to overtime pay. They never received that overtime pay, despite working excess hours.

121. Both before and after Xponential Fitness franchised the sixty-six gym studios to Defendant Brown and his company Defendant MDPro, the companies failed to credit instructors or coaches for time spent during training. For instance:

    a.    Plaintiff Coleman, who worked as a specialist and instructor at the CycleBar studio in Northgate, Colorado, spent one workweek in training for at least twenty hours per and was not paid at all for this time.

    b.    Plaintiff Lounsbery, who worked as the general manager and as an instructor at the Pure Barre studio in Williamsburg, Virginia, was not paid for time she spent training online or for required certifications. Instead, she was only paid for the time she spent training on Zoom with a master trainer from corporate.

c.      Plaintiff Twiddy, who worked as lead instructor at the Pure Barre studio in Williamsburg, Virginia, was not paid for time she spent training online or for required certifications.  Instead, she was only paid for the time she spent training on Zoom with a master trainer from corporate.

## V.      COLLECTIVE ACTION ALLEGATIONS

### A.      The Federal Law Collective Actions

122.      All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

123.      Plaintiffs bring Count I pursuant to the Fair Labor Standards Act (FLSA) as representatives of themselves and all other similarly situated individuals of the proposed opt-in class (the "Federal Minimum Wage Collective"), which is defined as follows:

**All individuals jointly employed by Defendants for whom the following is true: (a) who, on or after September 1, 2023, did not receive any pay for a workweek and therefore did not receive the federal minimum wage for all hours worked in the workweek; and/or (b) who, on or after September 1, 2023, received some pay for a workweek but, when that pay is divided by the total number of hours worked in the workweek, the regular hourly rate is less than the federal minimum wage.**

124.      Plaintiffs bring Count II pursuant to the FLSA as representatives of themselves and all other similarly situated individuals of the proposed opt-in class (the "Federal Overtime Collective"), which is defined as follows:

**All individuals jointly employed by Defendants for whom the following is true: (a) who, on or after September 1, 2023, did not receive any pay for a workweek, worked in excess of forty hours for that workweek, and therefore did not receive the time-and-a-half the federal minimum wage for all hours worked over forty in the workweek; and/or (b) who, on or after September 1, 2023, worked in excess of forty hours for a workweek, received some pay for a workweek but, when that pay is divided by the total number of hours worked in the workweek, did not receive time-and-a-half for every hour worked over forty in the workweek.**

125.    Plaintiffs bring Count III pursuant to the FLSA as representatives of themselves and all other similarly situated individuals of the proposed opt-in class (the "Federal Class Preparation and Training Overtime Collective"), which is defined as follows:

**All instructors or coaches jointly employed by Defendants for whom the following is true: (a) who, on or after September 1, 2023, spent time during a workweek by preparing for a class or receiving training; (b) who did not have that time spent preparing for a class or receiving training credited to them; (c) who, had that time spent preparing for a class or receiving training been credited to them, they would have worked over forty hours in that workweek; and (d) who did not receive time-and-a-half for each hour worked over forty in that workweek.**

126.    Plaintiffs bring Count IV pursuant to the FLSA as representatives of themselves and all other similarly situated individuals of the proposed opt-in class (the "Pre-Franchising Federal Class Preparation and Training Overtime Collective"), which is defined as follows:

**All instructors or coaches employed by Xponential Fitness for whom the following is true: (a) who, before September 1, 2023, spent time during a workweek by preparing for a class or receiving training; (b) who did not have that time spent preparing for a class or receiving training credited to them; (c) who, had that time spent preparing for a class or receiving training been credited to them, they would have worked over forty hours in that workweek; and (d) who did not receive time-and-a-half for each hour worked over forty in that workweek.**

127.    Counts I, II, III, and IV should proceed as a collective action because Plaintiffs, the Federal Minimum Wage Collective, the Federal Overtime Collective, the Federal Class Preparation and Training Overtime Collective, and the Pre-Franchising Federal Class Preparation and Training Overtime Collective (collectively, the "Federal Collectives") worked pursuant to common policies described in this FAC and are "similarly situated" under 29 U.S.C. § 216(b).

128.    Defendants' failure to pay minimum wage or overtime compensation results from generally applicable practices and policies that do not depend on the personal circumstances of the individual members of the Federal Collectives.

129.    Plaintiffs' experiences are typical of the experiences of the individual members of the Federal Collectives and the specific job titles or precise job requirements of the various individual members do not prevent collective treatment.

130.    Absent a collective action, members of the Federal Collectives will not obtain redress for their injuries and Defendants will retain the proceeds of their violations of the law.

131.    Individual litigation would be unduly burdensome to the judicial system. Concentrating the litigation in one forum will promote judicial economy and consistency.

132.    The precise size and identity of the proposed Federal Collectives should be ascertainable from business records, tax records, and/or employee or personnel records of Defendants.  Upon information or belief, the size of the Federal Collectives is as large as 880 employees across 17 different states.

133.    Accordingly, the proposed Federal Collectives of similarly situated plaintiffs should be certified as defined in this FAC.

**B.    The Ohio Law Collective Actions**

134.    All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

135.    Plaintiffs McGill, Oliveira, Curry, Brennan, and Fernandez (collectively, the "Ohio Plaintiffs") bring Count V pursuant to Article II, Section 34a of the Ohio Constitution and Ohio Revised Code Chapter 4111 as representatives of themselves and all other similarly situated individuals of the proposed opt-in class (the "Ohio Minimum Wage Collective"):

**All individuals jointly employed by Defendants in Ohio for whom the following is true: (a) who, on or after September 1, 2023, did not receive any pay for a workweek and therefore did not receive the Ohio minimum wage for all hours worked in the workweek; and/or (b) who, on or after September 1, 2023, received some pay for a workweek but, when that pay is divided by the total number of hours**

**worked in the workweek, the regular hourly rate is less than the Ohio minimum wage.**

136.    Plaintiff Fernandez brings Count VI pursuant to Article II, Section 34a of the Ohio Constitution and Ohio Revised Code Chapter 4111 as a representative of herself and all other similarly situated individuals of the proposed opt-in class (the "Ohio Overtime Collective"):

> **All individuals jointly employed by Defendants in Ohio for whom the following is true: (a) who, on or after September 1, 2023, did not receive any pay for a workweek, worked in excess of forty hours for that workweek, and therefore did not receive time-and-a-half the Ohio minimum wage for all hours worked over forty in the workweek; and/or (b) who, on or after September 1, 2023, received some pay for a workweek but, when that pay is divided by the total number of hours worked in the workweek, did not receive time-and-a-half for every hour worked over forty in the workweek.**

137.    Counts V and VI should proceed as a collective action because the Ohio Plaintiffs, the Ohio Minimum Wage Collective, and the Ohio Overtime Collective (collectively, the "Ohio Collectives"), worked pursuant to common policies described in this FAC and are "similarly situated" under Ohio Revised Code Section 4111.10(C).

138.    Defendants' failure to pay minimum wage or overtime compensation results from generally applicable practices and policies that do not depend on the personal circumstances of the individual members of the Ohio Collectives.

139.    Plaintiffs' experiences are typical of the experiences of the individual members of the Ohio Collectives and the specific job titles or precise job requirements of the various individual members do not prevent collective treatment.

140.    Absent a collective action, members of the Ohio Collectives will not obtain redress for their injuries and Defendants will retain the proceeds of their violations of the law.

141. Individual litigation would be unduly burdensome to the judicial system. Concentrating the litigation in one forum will promote judicial economy and consistency.

142. The precise size and identity of the proposed Ohio Collectives should be ascertainable from business records, tax records, and/or employee or personnel records of Defendants. Upon information or belief, the size of the Ohio Collectives is as large as 50 employees in the State of Ohio.

143. Accordingly, the proposed Ohio Collectives of similarly situated plaintiffs should be certified as defined in this FAC.

## VI.   CLASS ACTION ALLEGATIONS

### A.   The Ohio Law Class Actions

144. All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

145. The Ohio Plaintiffs bring Count VII on behalf of themselves and as a class action under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) seeking equitable relief and damages on behalf of the following class (the "Ohio Criminal Acts Class"):

**All individuals jointly employed by Defendants in Ohio who, on or after September 1, 2023, did not receive the Ohio minimum wage for hours worked and/or did not receive all overtime compensation required by Ohio law.**

146. The Ohio Plaintiffs bring Count VIII on behalf of themselves and as a class action under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) seeking equitable relief and damages on behalf of the following class (the "Ohio Prompt Pay Class"):

**All individuals jointly employed by Defendants in Ohio who, on or after September 1, 2023, did not receive all wages owed within thirty days beyond the regularly scheduled payday.**

**B.    The California Class Actions**

147.    All preceding paragraphs are incorporated by reference as if fully restated in this

paragraph.

148.    Plaintiffs Kirkpatrick, Hilton, and McConnell (collectively, the "California

Plaintiffs") bring Count IX on behalf of themselves and as a class action under Fed. R. Civ. P.

23(a), (b)(1), (b)(2), and (b)(3) seeking equitable relief and damages on behalf of the following

class (the "California Minimum Wage Class"):

> **All individuals jointly employed by Defendants in California for whom the following is true: (a) who, on or after September 1, 2023, did not receive any pay for a workweek and therefore did not receive the California minimum wage for all hours worked in the workweek; and/or (b) who, on or after September 1, 2023, received some pay for a workweek but, when that pay is divided by the total number of hours worked in the workweek, the regular hourly rate is less than the California minimum wage.**

149.    The California Plaintiffs bring Count X on behalf of themselves and as a class

action under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) seeking equitable relief and damages

on behalf of the following class (the "California Prompt Pay Class"):

> **All individuals jointly employed by Defendants in California who, on or after September 1, 2023, did not receive all wages owed as follows: (a) if the employee was discharged and Defendants did not pay all outstanding wages immediately; or (b) if the employee quit, and Defendants did not pay all outstanding wages within seventy-two hours.**

**C.    The Colorado Class Action**

150.    All preceding paragraphs are incorporated by reference as if fully restated in this

paragraph.

151.    Plaintiff Coleman brings Count XI on behalf of herself and as a class action under

Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) seeking equitable relief and damages on behalf of

the following class (the "Colorado Minimum Wage Class"):

**All individuals jointly employed by Defendants in Colorado for whom the following is true: (a) who, on or after September 1, 2023, did not receive any pay for a workweek and therefore did not receive the Colorado minimum wage for all hours worked in the workweek; and/or (b) who, on or after September 1, 2023, received some pay for a workweek but, when that pay is divided by the total number of hours worked in the workweek, the regular hourly rate is less than the Colorado minimum wage.**

D.     **The Georgia Class Actions**

152.     All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

153.     Plaintiffs Edwards-Moody and Dickey (collectively, the "Georgia Plaintiffs") bring Count XII on behalf of themselves and as a class action under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) seeking equitable relief and damages on behalf of the following class (the "Georgia Minimum Wage Class"):

**All individuals jointly employed by Defendants in Georgia for whom the following is true: (a) who, on or after September 1, 2023, did not receive any pay for a workweek and therefore did not receive the Georgia minimum wage for all hours worked in the workweek; and/or (b) who, on or after September 1, 2023, received some pay for a workweek but, when that pay is divided by the total number of hours worked in the workweek, the regular hourly rate is less than the Georgia minimum wage.**

E.     **Illinois Class Action**

154.     All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

155.     Plaintiffs Cercello and Carey (collectively, the "Illinois Plaintiffs") bring Count XIII on behalf of themselves and as a class action under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) seeking equitable relief and damages on behalf of the following class (the "Illinois Minimum Wage Class"):

**All individuals jointly employed by Defendants in Illinois for whom the following is true: (a) who, on or after September 1, 2023, did not receive any pay for a**

**workweek and therefore did not receive the Illinois minimum wage for all hours worked in the workweek; and/or (b) who, on or after September 1, 2023, received some pay for a workweek but, when that pay is divided by the total number of hours worked in the workweek, the regular hourly rate is less than the Illinois minimum wage.**

**F.     Kansas Class Action**

156.    Plaintiff Murrell brings Count XIV on behalf of herself and as a class action under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) seeking equitable relief and damages on behalf of the following class (the "Kansas Prompt Pay Class"):

> **All individuals jointly employed by Defendants in Kansas who, on or after September 1, 2023, did not receive all wages owed on a regularly scheduled payday.**

**G.     The Michigan Class Action**

157.    Plaintiffs Eggleston and Weinert (collectively, the "Michigan Plaintiffs") bring Count XV on behalf of themselves and as a class action under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) seeking equitable relief and damages on behalf of the following class (the "Michigan Minimum Wage Class"):

> **All individuals jointly employed by Defendants in Michigan for whom the following is true: (a) who, on or after September 1, 2023, did not receive any pay for a workweek and therefore did not receive the Michigan minimum wage for all hours worked in the workweek; and/or (b) who, on or after September 1, 2023, received some pay for a workweek but, when that pay is divided by the total number of hours worked in the workweek, the regular hourly rate is less than the Michigan minimum wage.**

**H.     The Minnesota Class Actions**

158.    Plaintiff Thureen and Scott bring Count XVI on behalf of themselves and as a class action under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) seeking equitable relief and damages on behalf of the following class (the "Minnesota Minimum Wage Class"):

> **All individuals jointly employed by Defendants in Minnesota for whom the following is true: (a) who, on or after September 1, 2023, did not receive any pay**

**for a workweek and therefore did not receive the Minnesota minimum wage for all hours worked in the workweek; and/or (b) who, on or after September 1, 2023, received some pay for a workweek but, when that pay is divided by the total number of hours worked in the workweek, the regular hourly rate is less than the Minnesota minimum wage.**

159.     Plaintiff Thureen brings Count XVII on behalf of herself and as a class action

under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) seeking equitable relief and damages on

behalf of the following class (the "Minnesota Overtime Class"):

**All individuals jointly employed by Defendants in Minnesota for whom the following is true: (a) who, on or after September 1, 2023, did not receive any pay for a workweek, worked in excess of forty hours for that workweek, and therefore did not receive time-and-a-half the Minnesota minimum wage for all hours worked over forty in the workweek; and/or (b) who, on or after September 1, 2023, received some pay for a workweek but, when that pay is divided by the total number of hours worked in the workweek, did not receive time-and-a-half for every hour worked over forty in the workweek.**

**I.      The New Mexico Class Action**

160.     Plaintiff Karelas brings Count XVIII on behalf of herself and as a class action

under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) seeking equitable relief and damages on

behalf of the following class (the "New Mexico Minimum Wage Class"):

**All individuals jointly employed by Defendants in New Mexico for whom the following is true: (a) who, on or after September 1, 2023, did not receive any pay for a workweek and therefore did not receive the New Mexico minimum wage for all hours worked in the workweek; and/or (b) who, on or after September 1, 2023, received some pay for a workweek but, when that pay is divided by the total number of hours worked in the workweek, the regular hourly rate is less than the New Mexico minimum wage.**

**J.      The North Dakota Class Actions**

161.     Plaintiff Hase brings Count XVIV on behalf of herself and as a class action under

Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) seeking equitable relief and damages on behalf of

the following class (the "North Dakota Minimum Wage Class"):

**All individuals jointly employed by Defendants in North Dakota for whom the following is true: (a) who, on or after September 1, 2023, did not receive any pay for a workweek and therefore did not receive the North Dakota minimum wage for all hours worked in the workweek; and/or (b) who, on or after September 1, 2023, received some pay for a workweek but, when that pay is divided by the total number of hours worked in the workweek, the regular hourly rate is less than the North Dakota minimum wage.**

162.    Plaintiff Hase brings Count XX on behalf of herself and as a class action under

Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) seeking equitable relief and damages on behalf of

the following class (the "North Dakota Overtime Class"):

**All individuals jointly employed by Defendants in North Dakota for whom the following is true: (a) who, on or after September 1, 2023, did not receive any pay for a workweek, worked in excess of forty hours for that workweek, and therefore did not receive time-and-a-half the North Dakota minimum wage for all hours worked over forty in the workweek; and/or (b) who, on or after September 1, 2023, received some pay for a workweek but, when that pay is divided by the total number of hours worked in the workweek, did not receive time-and-a-half for every hour worked over forty in the workweek.**

**K.    The South Carolina Class Action**

163.    Plaintiff Smith brings Count XXI on behalf of herself and as a class action under

Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) seeking equitable relief and damages on behalf of

the following class (the "South Carolina Prompt Pay Class"):

**All individuals jointly employed by Defendants in South Carolina who, on or after September 1, 2023, did not receive all wages owed on a regularly scheduled payday.**

**L.    The Virginia Class Actions**

164.    Plaintiffs Lounsbery and Twiddy (collectively, the "Virginia Plaintiffs") bring

Count XXII on behalf of herself and as a class action under Fed. R. Civ. P. 23(a), (b)(1), (b)(2),

and (b)(3) seeking equitable relief and damages on behalf of the following class (the "Virginia

Minimum Wage Class"):

**All individuals jointly employed by Defendants and working for them in Virginia for whom the following is true: (a) who, on or after September 1, 2023, did not receive any pay for a workweek and therefore did not receive the Virginia minimum wage for all hours worked in the workweek; and/or (b) who, on or after September 1, 2023, received some pay for a workweek but, when that pay is divided by the total number of hours worked in the workweek, the regular hourly rate is less than the Virginia minimum wage.**

165. The Virginia Plaintiffs bring Count XXIII on behalf of herself and as a class action under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) seeking equitable relief and damages on behalf of the following class (the "Virginia Overtime Class"):

**All individuals jointly employed by Defendants in Virginia for whom the following is true: (a) who, on or after September 1, 2023, did not receive any pay for a workweek, worked in excess of forty hours for that workweek, and therefore did not receive time-and-a-half the Virginia minimum wage for all hours worked over forty in the workweek; and/or (b) who, on or after September 1, 2023, received some pay for a workweek but, when that pay is divided by the total number of hours worked in the workweek, did not receive time-and-a-half for every hour worked over forty in the workweek.**

166. Virginia Plaintiffs bring Count XXIV on behalf of herself and as a class action under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) seeking equitable relief and damages on behalf of the following class (the "Virginia Prompt Pay Class"):

**All individuals jointly employed by Defendants in Virginia who, on or after September 1, 2023, did not receive all wages owed on a regularly scheduled payday.**

**M.    The Class Action Requirements for All States**

167. While Plaintiffs do not know the exact number of people within various putative state law classes defined above (collectively, the "State Classes"), there are likely to be at least fifty, or more, for each class given that the total number of employees who worked for the sixty-six franchised gym studios was over 800.

168. Common questions of law and fact exist as to all members of the State Classes. All employees, in every state, were simply not paid anything for hours worked in a particular

workweek, including for any overtime hours. As a result, common questions of law and fact include without limitation the following:

      a.      Whether Defendants are joint employers.

      b.      Whether Defendants failed to pay Plaintiffs and the State Classes any wages for hours worked, thus reducing their pay to nothing, which is below the federal minimum wage and every state minimum wage.

      c.      Whether Defendants failed to pay the State Classes any wages for hours worked, thus reducing their pay to nothing.

      d.      The minimum wages that Defendants owe to the State Classes.

      e.      The overtime compensation that Defendants owe to Plaintiffs and the State Classes who worked in excess of forty hours in a workweek.

      f.      The liquidated damages Defendants owe to the State Classes.

      g.      The treble damages Defendants owe to the State Classes.

      h.      The punitive damages Defendants owe to the State Classes.

      i.      The waiting time penalties Defendants owe to the State Classes.

      j.      The attorneys' fees Defendants owe to Plaintiffs and the State Classes.

169. The claims of Plaintiffs are typical of the claims belonging to their respective State Classes. Plaintiffs and members of the State Classes are all similarly affected.

170. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the State Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of employment, collective, and class litigation.

171. The prosecution of separate actions by individual members of the State Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards

of conduct for Defendants.  Alternatively, adjudications with respect to individual members of the State Classes would, as a practical matter, be dispositive of the interests of the other members of the State Classes not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

172.    For the claims asserted by members of the State Classes, Defendants have acted or refused to act on grounds that apply generally to the members of the State Law Classes, so that final injunctive relief is appropriate.

173.    For the claims asserted by the State Classes, the common questions of law and fact predominate over any individual questions.  Furthermore, class action treatment is a superior method for the fair and efficient adjudication of the controversy because such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication that individual actions would cause.  Finally, the benefits of proceeding through the class mechanism substantially outweigh any difficulties that may arise in the management of this class action.

## VII.    CLAIMS FOR RELIEF

**A.    Federal Law Claims**

## COUNT I

**Violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201, et. seq.
(Failure to Pay Minimum Wage)**

**By Plaintiffs, on Behalf of Themselves and Those Similarly Situated,
Against All Defendants**

174.    All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

175. Plaintiffs and all others similarly situated were at all relevant times an "employee[s]" within the meaning of the 29 U.S.C. § 203(e)(1).

176. Defendants were at all relevant times "employer[s]" within the meaning of 29 U.S.C. § 203(d).

177. Defendants violated 29 U.S.C. § 206 when they failed to pay Plaintiffs and all others similarly situated the federal minimum wage for all hours worked in a workweek.

178. Defendants' violations were willful.

179. As a proximate result of Defendants' actions, Plaintiffs and all others similarly situated have been and continues to be damaged in an amount to be determined at trial.

180. Pursuant 29 U.S.C. § 216(b), Plaintiffs and all others similarly situated are entitled to liquidated damages in an amount equal to the unpaid minimum wages.

181. Pursuant 29 U.S.C. § 216(b), Plaintiffs and all others similarly situated are entitled to reasonable attorneys' fees incurred in pursuing Count I.

## COUNT II

**Violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201, et. seq.
(Failure to Pay Overtime Compensation)**

**By Plaintiffs, on Behalf of Themselves and Those Similarly Situated,
Against All Defendants**

182. All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

183. Plaintiffs and all others similarly situated were at all relevant times an "employee[s]" within the meaning of the 29 U.S.C. § 203(e)(1).

184. Defendants were at all relevant times "employer[s]" within the meaning of 29 U.S.C. § 203(d).

185. Defendants violated 29 U.S.C. § 207 when they failed to pay Plaintiffs and all others similarly situated one-and-a-half times their regular hourly rate for all hours worked in excess of forty in a workweek.

186. Defendants' violations were willful.

187. As a proximate result of Defendants' actions, Plaintiffs and all others similarly situated have been and continues to be damaged in an amount to be determined at trial.

188. Pursuant 29 U.S.C. § 216(b), Plaintiffs and all others similarly situated are entitled to liquidated damages in an amount equal to the unpaid overtime compensation.

189. Pursuant 29 U.S.C. § 216(b), Plaintiffs and all others similarly situated are entitled to reasonable attorneys' fees incurred in pursuing Count II.

**COUNT III**

**Violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201, et. seq.**
**(Failure to Pay Overtime Compensation – Class Preparation and Training Time)**

**By Plaintiffs, on Behalf of Themselves and Those Similarly Situated,**
**Against All Defendants**

190. All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

191. Plaintiffs and all others similarly situated were at all relevant times an "employee[s]" within the meaning of the 29 U.S.C. § 203(e)(1).

192. Defendants were at all relevant times "employer[s]" within the meaning of 29 U.S.C. § 203(d).

193. Defendants violated 29 U.S.C. § 207 when they failed to pay Plaintiffs and all others similarly situated one-and-a-half times their regular hourly rate for all hours worked in excess of forty in a workweek.

194.     Defendants' violations were willful.

195.     As a proximate result of Defendants' actions, Plaintiffs and all others similarly situated have been and continues to be damaged in an amount to be determined at trial.

196.     Pursuant 29 U.S.C. § 216(b), Plaintiffs and all others similarly situated are entitled to liquidated damages in an amount equal to the unpaid overtime compensation.

197.     Pursuant 29 U.S.C. § 216(b), Plaintiffs and all others similarly situated are entitled to reasonable attorneys' fees incurred in pursuing Count III.

**COUNT IV**

**Violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201, et. seq.**
**(Failure to Pay Overtime Compensation –**
**Pre-Franchising Class Preparation and Training Time)**

**By Plaintiffs, on Behalf of Themselves and Those Similarly Situated,**
**Against Defendant XPOF**

198.     All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

199.     Plaintiffs were at all relevant times an "employee[s]" within the meaning of the 29 U.S.C. § 203(e)(1).

200.     Defendant XPOF was at all relevant times an "employer" within the meaning of 29 U.S.C. § 203(d).

201.     Defendant XPOF violated 29 U.S.C. § 207 when it failed to pay Plaintiffs and all others similarly situated one-and-a-half times their regular hourly rate for all hours worked in excess of forty in a workweek.

202.     Defendants XPOF's violations were willful.

203.     As a proximate result of Defendants XPOF's actions, Plaintiffs and all others similarly situated have been and continues to be damaged in an amount to be determined at trial.

204. Pursuant 29 U.S.C. § 216(b), Plaintiffs and all others similarly situated are entitled to liquidated damages in an amount equal to the unpaid overtime compensation.

205. Pursuant 29 U.S.C. § 216(b), Plaintiffs and all others similarly situated are entitled to reasonable attorneys' fees incurred in pursuing Count IV.

**B.    Ohio State Law Claims**

**COUNT V**

**Violation of the Ohio Constitution, Article II, Section 34a
and/or Ohio Revised Code Chapter 4111
(Failure to Pay Minimum Wage)**

**By the Ohio Plaintiffs, on Behalf of Themselves and Those Similarly Situated,
Against All Defendants**

206. All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

207. The Ohio Plaintiffs and all others similarly situated were at all relevant times "employee[s]" within the meaning of the Ohio Constitution, Article II, Section 34a.

208. Defendants were at all relevant times employer(s) within the meaning of the Ohio Constitution, Article II, Section 34a.

209. Defendants violated the Ohio Constitution, Article II, Section 34a and/or Ohio Revised Code Chapter 4111 when they failed to pay the Ohio Plaintiffs and all others similarly situated the Ohio minimum wage for all hours worked in a workweek.

210. Defendants' violations were willful.

211. As a proximate result of Defendants' actions, the Ohio Plaintiffs and all others similarly situated have been and continue to be damaged in an amount to be determined at trial.

212.     Pursuant to the Ohio Constitution, Article II, Section 34a, Plaintiffs and all others similarly situated are entitled to liquidated damages in an amount equal to the unpaid minimum wages.

213.     Pursuant to the Ohio Constitution, Article II, Section 34a, Plaintiffs and all others similarly situated are entitled to reasonable attorneys' fees incurred in pursuing Count V.

### COUNT VI

**Violation of the Ohio Constitution, Article II, Section 34a
and/or Ohio Revised Code Chapter 4111
(Failure to Pay Overtime Compensation)**

**By the Ohio Plaintiffs, on Behalf of Themselves and Those Similarly Situated,
Against All Defendants**

214.     All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

215.     The Ohio Plaintiffs and all others similarly situated were at all relevant times "employee[s]" within the meaning of the Ohio Constitution, Article II, Section 34a.

216.     Defendants were at all relevant times employer(s) within the meaning of the Ohio Constitution, Article II, Section 34a.

217.     Defendants violated the Ohio Constitution, Article II, Section 34a and/or Ohio Revised Code Chapter 4111 when they failed to pay the Ohio Plaintiffs and all others similarly situated one-and-a-half times their regular hourly rate for all hours worked in excess of forty in a workweek.

218.     Defendants' violations were willful.

219.     As a proximate result of Defendants' actions, the Ohio Plaintiffs and all others similarly situated have been and continue to be damaged in an amount to be determined at trial.

220.    Pursuant to the Ohio Constitution, Article II, Section 34a, the Ohio Plaintiffs and all others similarly situated are entitled to liquidated damages in an amount equal to the unpaid overtime compensation.

221.    Pursuant to the Ohio Constitution, Article II, Section 34a, the Ohio Plaintiffs and all others similarly situated are entitled to reasonable attorneys' fees incurred in pursuing Count VI.

## COUNT VII

### Violation of Ohio Revised Code Section 2307.60
### (Civil Liability for Criminal Acts – Failure to Minimum Wage or Overtime Compensation)

### By the Ohio Plaintiffs, on Behalf of Themselves and the Ohio Criminal Acts Class, Against All Defendants

222.    All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

223.    The Ohio Plaintiffs and the Ohio Criminal Acts Class are "anyone" within the meaning of Ohio Revised Code Section 2307.60(A)(1).

224.    Defendants engaged in a "criminal act" that "injured" the Ohio Plaintiffs and the Ohio Criminal Acts Class "in person" within the meaning of Ohio Revised Code Section 2307.60(A)(1) because their conduct is one or more of the following:

a.      A willful violation of 29 U.S.C. 215(a)(2) and thus a criminal violation under 29 U.S.C. 216(a).

b.      A violation of Ohio Revised Code Section 4111.13(C) and thus a criminal violation under Ohio Revised Code Section 4111.99(B).

225.     As a proximate result of Defendants' actions, the Ohio Plaintiffs and the Ohio Criminal Acts Class have been and continue to be damaged in an amount to be determined at trial.

226.     Consistent with Ohio Revised Code Section 2315.21, the Ohio Plaintiffs and the Ohio Criminal Acts Class are entitled to punitive damages because the actions or omissions of Defendants demonstrate malice or aggravated or egregious fraud, and/or Defendants as principals or masters knowingly authorized, participated in, or ratified the actions or omissions that so demonstrate.

227.     Consistent with the rule in *Columbus Finance, Inc. v. Howard*, 42 Ohio St.2d 178, 71 Ohio App.2d 174, 327 N.E.2d 654 (1975), and because the Ohio Plaintiffs and the Ohio Criminal Acts Class are entitled to punitive damages, Plaintiff is entitled to reasonable attorneys' fees incurred in pursuing Count VII.

## COUNT VIII

### Violation of Ohio Revised Code Section 4113.15
### (Failure to Tender Prompt Payment)

### By the Ohio Plaintiffs, on Behalf of Themselves and the Ohio Prompt Pay Class,
### Against All Defendants

228.     All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

229.     The Ohio Plaintiffs and the Ohio Prompt Pay Class were at all relevant times "employee[s]" within the meaning of Ohio Revised Code Chapter 4113.

230.     Defendants were at all relevant times employer(s) within the meaning of Ohio Revised Code Section 4113.15(D)(4).

231.    Defendants violated Ohio Revised Code Section 4113.15(A) when they failed to pay the Ohio Plaintiffs and the Ohio Prompt Pay Class all wages earned within the statutory period.

232.    Defendants failed to make such payments within thirty days of the "regularly scheduled payday(s)" required by Ohio Revised Code Section 4113.15(B).

233.    As a proximate result of Defendants actions, the Ohio Plaintiffs the Ohio Prompt Pay Class have been and continue to be damaged in an amount to be determined at trial.

234.    Pursuant to Ohio Revised Code Section 4113.15(B), the Ohio Plaintiffs and the Ohio Prompt Pay Class are entitled to liquidated damages in an amount equal to six percent of the unpaid compensation per payroll period or two hundred dollars per payroll period, whichever is greater.

**C.    California State Law Claims**

**COUNT IX**

**Violation of California Labor Code Sections 1182.11, 1182.12, 1194, 1194.2, and 1197
(Failure to Pay Minimum Wage)**

**By the California Plaintiffs, on Behalf of Themselves and the California Minimum Wage
Class, Against All Defendants**

235.    All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

236.    The California Plaintiffs and the California Minimum Wage Class were at all relevant times "employee[s]" within the meaning of California Labor Code Section 1197.

237.    Defendants were at all relevant times subject to California Labor Sections 1181.11, 1182.12, and the applicable wage orders of the California Industrial Welfare Commission.

238.    Defendants violated California Labor Code Section 1197 when they failed to pay the California Plaintiffs and the California Minimum Wage Class the California minimum wage for all hours worked in a workweek.

239.    Defendants' violations were willful.

240.    As a proximate result of Defendants' actions, the California Plaintiffs and the California Minimum Wage Class have been and continue to be damaged in an amount to be determined at trial.

241.    Pursuant California Labor Code Section 1194.2, the California Plaintiffs and the California Minimum Wage Class are entitled to liquidated damages in an amount equal to the unpaid minimum wages.

242.    Pursuant California Labor Code Section 1194.3, the California Plaintiffs and the California Minimum Wage Class are entitled to reasonable attorneys' fees incurred in pursuing Count IX.

## COUNT X

### Violation of California Labor Code Sections 201, 202, and 203
### (Failure to Tender Prompt Payment)

### By the California Plaintiffs, on Behalf of Themselves and the California Prompt Pay Class, Against All Defendants

243.    All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

244.    The California Plaintiffs and the California Prompt Pay Class were at all relevant times "employee[s]" within the meaning of California Labor Code Sections 201-203.

245.    Defendants were at all relevant times "employer[s]" within the meaning of California Labor Code Sections 201-203.

246.     Defendants violated California Labor Code Sections 201-203 when they failed to pay the California Plaintiffs and the California Prompt Pay Class all wages owed within the statutory periods.

247.     As a proximate result of Defendants' actions, the California Plaintiffs and the California Prompt Pay Class have been and continue to be damaged in an amount to be determined at trial.

248.     Pursuant California Labor Code Section 203, the California Plaintiffs and the California Prompt Pay Class are entitled to penalties of up to thirty days of wages for violations of California Labor Code Sections 201 or 202.

249.     Pursuant California Labor Code Section 218.5, the California Plaintiffs and the California Prompt Pay Class are entitled to reasonable attorneys' fees incurred in pursuing Count X.

**D.      Colorado State Law Claims**

### COUNT XI

**Violation of Colorado Minimum Wage Act, Colo. Rev. Stat. §§ 8-6-101, et seq., As Implemented by the Colorado Minimum Wage Order (Failure to Pay Minimum Wage)**

**By Plaintiff Coleman, on Behalf of Herself and the Colorado Minimum Wage Class, Against All Defendants**

250.     All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

251.     Plaintiff Coleman and the Colorado Minimum Wage Class were at all relevant times "employee[s]" within the meaning of Colorado Revised Statutes Section 8-6-116(1) and Section 1.5 of the Colorado Minimum Wage Order (CMWO).

252.     Defendants were at all relevant times "employer[s]" within the meaning of Colorado Revised Statutes Section 8-6-116(1) and Section 1.6 of the CMWO.

253.     Defendants violated Colorado Revised Statutes Section 8-6-116(1) and Section 3.1 of the CMWO when they failed to pay Plaintiff Coleman and the Colorado Minimum Wage Class the Colorado minimum wage for all hours worked in a workweek.

254.     As a proximate result of Defendants' actions, Plaintiff Coleman the Colorado Minimum Wage Class have been and continue to be damaged in an amount to be determined at trial.

255.     Pursuant to Colorado Revised Statutes Section 8-6-118, Plaintiff Coleman the Colorado Minimum Wage Class are entitled to reasonable attorneys' fees incurred in pursuing Count XI.

**E.     Georgia State Law Claims**

**COUNT XII**

**Violation of the Georgia Minimum Wage Law, O.C.G. § 34-1-1, et seq.**
**(Failure to Pay Minimum Wage)**

**By the Georgia Plaintiffs, on Behalf of Themselves and the Georgia Minimum Wage Class,**
**Against All Defendants**

255.     All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

256.     The Georgia Plaintiffs and the Georgia Minimum Wage Class were at all relevant times "employee[s]" within the meaning of the Official Code of Georgia Section 34-4-3.

257.     Defendants were at all relevant times "employer[s]" within the meaning of the Official Code of Georgia Section 34-4-3.

258.    Defendants violated the Official Code of Georgia Section 34-4-3 when they failed to pay the Georgia Plaintiffs and the Georgia Minimum Wage Class the Georgia minimum wage for all hours worked in a workweek.

259.    As a proximate result of Defendants' actions, the Georgia Plaintiffs and the Georgia Minimum Wage Class have been and continue to be damaged in an amount to be determined at trial.

260.    Pursuant to the Official Code of Georgia Section 34-4-6, the Georgia Plaintiffs and the Georgia Minimum Wage Class are entitled to liquidated damages in an amount equal to the unpaid minimum wages.

261.    Pursuant to the Official Code of Georgia Section 34-4-6, the Georgia Plaintiffs and the Georgia Minimum Wage Class are entitled to reasonable attorneys' fees incurred in pursuing Count XII.

**F.    Illinois State Law Claims**

**COUNT XIII**

**Violation of the Illinois Minimum Wage Law, 820 ILCS §§ 105/1, et seq.**
**(Failure to Pay Minimum Wage)**

**By the Illinois Plaintiffs, on Behalf of Themselves and the Illinois Minimum Wage Class,**
**Against All Defendants**

262.    All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

263.    The Illinois Plaintiffs and the Illinois Minimum Wage Class were at all relevant times "employee[s]" within the meaning of the 820 Illinois Compiled Statutes Annotated Section 105/3(d).

264.     Defendants were at all relevant times "employer[s]" within the meaning of 820 Illinois Compiled Statutes Annotated Section 105/3(c).

265.     Defendants violated the 820 Illinois Compiled Statutes Annotated Section 105/4(a) when they failed to pay the Illinois Plaintiffs and the Illinois Minimum Wage Class the Illinois minimum wage for all hours worked in a workweek.

266.     As a proximate result of Defendants' actions, the Illinois Plaintiffs and the Illinois Minimum Wage Class have been and continue to be damaged in an amount to be determined at trial.

267.     Pursuant to the 820 Illinois Compiled Statutes Annotated Section 105/12(a), the Illinois Plaintiffs and the Illinois Minimum Wage Class are entitled to treble damages on the unpaid minimum wages, plus five precent of the unpaid minimum wages.

268.     Pursuant to the 820 Illinois Compiled Statutes Annotated Section 105/12(a), the Illinois Plaintiffs and the Illinois Class are entitled to reasonable attorneys' fees incurred in pursuing Count XIII.

**G.     Kansas State Law Claims**

**COUNT XIV**

**Violation of the Kansas Wage Payment Act, Kan. Stat. §§ 44-313, et seq.**
**(Failure to Tender Prompt Payment)**

**By Plaintiff Murrell, on Behalf of Herself and the Kansas Prompt Pay Class,**
**Against All Defendants**

269.     All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

270.     Plaintiff Murrell and the Kansas Prompt Pay Class were at all relevant times "employee[s]" within the meaning of the Kansas Statutes Section 44-313(b).

271.    Defendants were at all relevant times "employer[s]" within the meaning of the Kansas Statutes Section 44-313(a).

272.    Defendants violated Kansas Statutes Section 44-314 when they failed to pay Plaintiff Murrell and the Kansas Prompt Pay Class all wages owed within the statutory period.

273.    As a proximate result of Defendants' actions, Plaintiff Murrell and the Kansas Prompt Pay Class have been and continue to be damaged in an amount to be determined at trial.

274.    Pursuant to Kansas Statutes Section 44-315(b), Defendants' violations were willful and therefore Plaintiff Murrell and the Kansas Prompt Pay Class are entitled to one percent of the unpaid wages for each day the wages are late—except Sunday and legal holidays—up to a maximum of one hundred percent.

**H.      Michigan State Law Claims**

**COUNT XV**

**Violation of the Michigan Workforce Opportunity Wage Act, MCLS §§ 408.411, et seq. (Failure to Pay Minimum Wage)**

**By the Michigan Plaintiffs, on Behalf of Themselves and the Michigan Minimum Wage Class, Against All Defendants**

275.    All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

276.    The Michigan Plaintiffs the Michigan Minimum Wage Class were at all relevant times "employee[s]" within the meaning of Michigan Compiled Law Service Section 408.412(c).

277.    Defendants were at all relevant times "employer[s]" within the meaning of Michigan Compiled Law Service Section 408.412(d).

278. Defendants violated the Michigan Compiled Law Service Section 408.414 when they failed to pay the Michigan Plaintiffs and the Michigan Minimum Wage Class the Michigan minimum wage for all hours worked in a workweek.

279. As a proximate result of Defendants' actions, the Michigan Plaintiffs and the Michigan Minimum Wage Class have been and continue to be damaged in an amount to be determined at trial.

280. Pursuant to the Michigan Compiled Law Service Section 408.419(1)(a), the Michigan Plaintiffs and the Michigan Minimum Wage Class are entitled to liquidated damages in an amount equal to the unpaid minimum wages.

281. Pursuant to the Michigan Compiled Law Service Section 408.419(1)(a), the Michigan Plaintiffs and the Michigan Minimum Wage Class are entitled to reasonable attorneys' fees incurred in pursuing Count XV.

**I.    Minnesota State Law Claims**

**COUNT XVI**

**Violation of the Minnesota Fair Labor Standards Act, Minn. Stat. §§ 1721.11, et seq (Failure to Pay Minimum Wage)**

**By the Minnesota Plaintiffs, on Behalf of Themselves and the Minnesota Minimum Wage Class, Against All Defendants**

282. All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

283. The Minnesota Plaintiffs and the Minnesota Minimum Wage Class were at all relevant times "employee[s]" within the meaning of Minnesota Statutes Section 177.23(7).

284. Defendants were at all relevant times "employer[s]" and "large employer[s]" within the meaning of Minnesota Statutes Sections 177.23(6) and 177.24(1)(a)(1).

285. Defendants violated the Minnesota Statutes Section 177.24 when they failed to pay the Minnesota Plaintiffs and the Minnesota Minimum Wage Class the Minnesota "large employer" minimum wage for all hours worked in a workweek.

286. As a proximate result of Defendants' actions, the Minnesota Plaintiffs and the Minnesota Minimum Wage Class have been and continue to be damaged in an amount to be determined at trial.

287. Pursuant to the Minnesota Statutes Section 177.27(8), the Minnesota Plaintiffs and the Minnesota Minimum Wage Class are entitled to liquidated damages in an amount equal to the unpaid minimum wages.

288. Pursuant to the Minnesota Statutes Section 177.27(8), the Minnesota Plaintiffs and the Minnesota Class are entitled to reasonable attorneys' fees incurred in pursuing Count XVI.

## COUNT XVII

### Violation of the Minnesota Fair Labor Standards Act, Minn. Stat. §§ 1721.11, et seq (Failure to Pay Overtime Compensation)

### By Plaintiff Thureen, on Behalf of Herself and the Minnesota Overtime Class, Against All Defendants

289. All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

290. Plaintiff Thureen and the Minnesota Overtime Class were at all relevant times "employee[s]" within the meaning of Minnesota Statutes Section 177.23(7).

291. Defendants were at all relevant times "employer[s]" and "large employer[s]" within the meaning of Minnesota Statutes Sections 177.23(6) and 177.24(1)(a)(1).

292. Defendants violated the Minnesota Statutes Section 177.24 when they failed to pay Plaintiff Thureen and the Minnesota Overtime Class one-and-a-half times their regular hourly rate for all hours worked in excess of forty in a workweek.

293. As a proximate result of Defendants' actions, Plaintiff Thureen and the Minnesota Overtime Class have been and continue to be damaged in an amount to be determined at trial.

294. Pursuant to the Minnesota Statutes Section 177.27(8), Plaintiff Thureen and the Minnesota Overtime Class are entitled to liquidated damages in an amount equal to the unpaid minimum wages.

295. Pursuant to the Minnesota Statutes Section 177.27(8), Plaintiff Thureen and members of the Minnesota Overtime Class are entitled to reasonable attorneys' fees incurred in pursuing Count XVII.

**J.    New Mexico State Law Claims**

**COUNT XVIII**

**Violation of the New Mexico Minimum Wage Act, N.M. Stat. Ann. §§ 50-4-20, et seq.
(Failure to Pay Minimum Wage)**

**By Plaintiff Karelas, on Behalf of Herself and the New Mexico Minimum Wage Class,
Against All Defendants**

296. All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

297. Plaintiff Karelas and the New Mexico Minimum Wage Class were at all relevant times "employee[s]" within the meaning of New Mexico Statutes Section 50-4-21(C).

298. Defendants were at all relevant times "employer[s]" within the meaning of New Mexico Statutes Section 50-4-21(B).

299.    Defendants violated New Mexico Statutes Section 50-4-22(A), when they failed to pay Plaintiff Karelas and the New Mexico Minimum Wage Class the New Mexico minimum wage for all hours worked in a workweek.

300.    As a proximate result of Defendants' actions, Plaintiff Karelas and the New Mexico Minimum Wage Class have been and continue to be damaged in an amount to be determined at trial.

301.    Pursuant to New Mexico Statutes Section 50-4-26(C), Plaintiff Karelas and the New Mexico Minimum Wage Class are entitled to liquidated damages in an amount equal to the unpaid minimum wages.

302.    Pursuant to New Mexico Statutes Section 50-4-26(E), Plaintiff Karelas and the New Mexico Minimum Wage Class are entitled to reasonable attorneys' fees incurred in pursuing Count XVIII.

**K.      North Dakota State Law Claims**

**COUNT XVIV**

**Violation of N.D. Cent. Code §§ 34-06-03, 34-06-22 and N.D. Admin. Code § 46-02-07-02
(Failure to Pay Minimum Wage)**

**By Plaintiff Hase, on Behalf of Herself and the North Dakota Minimum Wage Class,
Against All Defendants**

303.    All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

304.    Plaintiff Hase and the North Dakota Minimum Wage Class were at all relevant times "employee[s]" within the meaning of North Dakota Century Code Section 34-06-01(2).

305.    Defendants were at all relevant times "employer[s]" within the meaning of North Dakota Century Code Section 34-06-01(3).

306.     Defendants violated the North Dakota Century Code Sections 34-06-03 and 34-06-22, and North Dakota Administrative Code Section 46-02-07-02(1), when they failed to pay Plaintiff Hase and the North Dakota Minimum Wage Class the North Dakota minimum wage for all hours worked in a workweek.

307.     As a proximate result of Defendants' actions, Plaintiff Hase and North Dakota Minimum Wage Class have been and continue to be damaged in an amount to be determined at trial.

## COUNT XX

**Violation of N.D. Cent. Code §§ 34-06-03 and N.D. Admin. Code § 46-02-07-02**
**(Failure to Pay Overtime Compensation)**

**By Plaintiff Hase, on Behalf of Herself and the North Dakota Overtime Class,**
**Against All Defendants**

308.     All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

309.     Plaintiff Hase and the North Dakota Overtime Class were at all relevant times "employee[s]" within the meaning of North Dakota Century Code Section 34-06-01(2).

310.     Defendants were at all relevant times "employer[s]" within the meaning of North Dakota Century Code Section 34-06-01(3).

311.     Defendants violated the North Dakota Administrative Code Section 46-02-07-02(4), when they failed to pay Plaintiff Hase and the North Dakota Overtime Class one-and-a-half times their regular hourly rate for all hours worked in excess of forty in a workweek.

312.     As a proximate result of Defendants' actions, Plaintiff Hase and North Dakota Overtime Class have been and continue to be damaged in an amount to be determined at trial.

**L.    South Carolina State Law Claims**

**COUNT XXI**

**Violation of the South Carolina Wage Payment Act, S.C. Code Ann. §§ 41-10-10, et seq. (Failure to Tender Prompt Payment)**

**By Plaintiff Smith, on Behalf of Herself and the South Carolina Prompt Pay Class, Against All Defendants**

313.    All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

314.    Plaintiff Smith and the South Carolina Prompt Pay Class were at all relevant times "employee[s]" within the meaning of the South Carolina Statutes Section 41-10-30.

315.    Defendants were at all relevant times "employer[s]" within the meaning of the South Carolina Statutes Section 41-10-10(1).

316.    Defendants violated South Carolina Statutes Section 41-10-30(A) and Section 41-10-40(D) when they failed to pay Plaintiff Smith and the South Carolina Prompt Pay Class all wages owed within the statutory period.

317.    As a proximate result of Defendants' actions, Plaintiff Smith and the South Carolina Prompt Pay Class have been and continue to be damaged in an amount to be determined at trial.

318.    Pursuant to South Carolina Statutes Section 41-10-80(C), Plaintiff Smith and the South Carolina Prompt Pay Class are entitled to three times the full amount of the unpaid wages.

319.    Pursuant to South Carolina Statutes Section 41-10-80(C), Plaintiff Smith and the South Carolina Prompt Pay Class are entitled to reasonable attorneys' fees incurred in pursuing Count XXI.

M.      **Virginia State Law Claims**

**COUNT XXII**

**Violation of the Virginia Minimum Wage Act, Va. Code Ann. §§ 40.1-28.8, et seq.
(Failure to Pay Minimum Wage)**

**By the Virginia Plaintiffs, on Behalf of Themselves and the Virginia Minimum Wage Class,
Against All Defendants**

320.    All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

321.    The Virginia Plaintiffs and the Virginia Minimum Wage Class were at all relevant times "employee[s]" within the meaning of Virginia Code Section 40.1-28.9(A).

322.    Defendants were at all relevant times "employer[s]" within the meaning of Virginia Code Section 40.1-28.9(A).

323.    Defendants violated Virginia Code Section 40.1-28.10, when they failed to pay the Virginia Plaintiffs and the Virginia Minimum Wage Class the Virginia minimum wage for all hours worked in a workweek.

324.    As a proximate result of Defendants' actions, the Virginia Plaintiffs and the Virginia Minimum Wage Class have been and continue to be damaged in an amount to be determined at trial.

325.    Pursuant to Virginia Code Section 40.1-28.12, the Virginia Plaintiffs and the Virginia Minimum Wage Class are entitled to interest at eight percent per annum on the unpaid minimum wages.

326.    Pursuant to Virginia Code Section 40.1-28.12, the Virginia Plaintiffs and the Virginia Minimum Wage Class are entitled to reasonable attorneys' fees incurred in pursuing Count XXII.

## COUNT XXIII

### Violation of the Virginia Overtime Wage Act, Va. Code Ann. §§ 40.1-28.8, et seq.
### (Failure to Overtime Compensation)

### By the Virginia Plaintiffs, on Behalf of Themselves and the Virginia Overtime Class, Against All Defendants

327. All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

328. The Virginia Plaintiffs and the Virginia Overtime Class were at all relevant times "employee[s]" within the meaning of Virginia Code Section 40.1-29.2.

329. Defendants were at all relevant times "employer[s]" within the meaning of Virginia Code Section 40.1-29.2.

330. Defendants violated Virginia Code Section 40.1-29.2, when they failed to pay the Virginia Plaintiffs and the Virginia Overtime Class one-and-a-half times their regular hourly rate for all hours worked in excess of forty in a workweek.

331. As a proximate result of Defendants' actions, the Virginia Plaintiffs and the Virginia Overtime Class have been and continue to be damaged in an amount to be determined at trial.

332. Pursuant to Virginia Code Sections 40.1-29(J) and 40.1-29.2, the Virginia Plaintiffs and the Virginia Overtime Class are entitled to liquidated damages in an amount equal to the unpaid minimum wages.

333. Pursuant to Virginia Code Sections 40.1-29(J) and 40.1-29.2, the Virginia Plaintiffs and the Virginia Overtime Class are entitled to reasonable attorneys' fees incurred in pursuing Count XXIII.

## COUNT XXIV

**Violation of the Virginia Wage Payment Act, Va. Code Ann. §§ 40.1-29
(Failure to Tender Prompt Payment)**

**By the Virginia Plaintiffs, on Behalf of Themselves and the Virginia Prompt Pay Class,
Against All Defendants**

334.    All preceding paragraphs are incorporated by reference as if fully restated in this paragraph.

335.    The Virginia Plaintiffs and the Virginia Prompt Pay Class were at all relevant times "employee[s]" within the meaning of the Virginia Code Section 40.1-29.

336.    Defendants were at all relevant times "employer[s]" within the meaning of the Virginia Code Section 40.1-29.

337.    Defendants violated within the meaning of the Virginia Code Section 40.1-29 when they failed to pay the Virginia Plaintiffs and the Virginia Prompt Pay Class all wages owed within the statutory period.

338.    As a proximate result of Defendants' actions, the Virginia Plaintiffs and the Virginia Prompt Pay Class have been and continue to be damaged in an amount to be determined at trial.

339.    Pursuant to Virginia Code Section 40.1-29(J), the Virginia Plaintiffs and the Virginia Prompt Pay Class are entitled to liquidated damages in an amount equal to the unpaid wages and, because the violations were knowingly done, the Virginia Plaintiffs and the Virginia Prompt Pay Class are entitled to triple the amount of unpaid wages.

340.    Pursuant to Virginia Code Section 40.1-29(J), the Virginia Plaintiffs the Virginia Prompt Pay Class are entitled to reasonable attorneys' fees incurred in pursuing Count XXIV.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment in their favor on all claims in this Complaint and request the following relief:

A.      Economic compensatory damages in an amount to be determined at trial;

B.      Non-economic compensatory damages in an amount to be determined at trial;

C.      Liquidated, treble, punitive, or other exemplary damages in an amount to be determined at trial;

D.      Reasonable attorneys' fees incurred in pursuing the claims against Defendants;

E.      All costs and expenses incurred in pursuing the claims against Defendants;

F.      Pre- and post-judgment interest; and

G.      All other legal and equitable relief this Court and/or a jury determines is appropriate.

## IX.    JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury on all claims and issues that are triable.

Respectfully submitted,

By:  /s/ Jason E. Starling
Jason E. Starling (Ohio Bar No. 0082619)
WILLIS SPANGLER STARLING
4635 Trueman Boulevard, Suite 200
Hilliard, Ohio 43026
Telephone: (614) 586-7915
Facsimile: (614) 586-7901
jstarling@willisattorneys.com

John C. Camillus (Ohio Bar No. 0077435)
LAW OFFICES OF JOHN C. CAMILLUS, LLC
P.O. Box 141410
Columbus, Ohio 43214
Telephone: (614) 992-1000

Facsimile: (614) 559-6731
jcamillus@camilluslaw.com

*Attorneys for all Plaintiffs*